UNITED STATES v. NEW ENGLAND FISH EXCHANGE et al.

(District Court, D. Massachusetts.. July 11, 1919.)

No. 810.

1. COURTS ☞343—FEDERAL COURTS—PARTIES DEFENDANT—EQUITY RULE.
    Under equity rule 26 (201 Fed. v, 118 C. C. A. v), providing that several defendants may be joined to promote administration of justice, etc., three corporations were properly made parties defendant in suit seeking their dissolution under Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830) and Clayton Act, where transactions involved all related to conducting fish business in Boston and were so interwoven that three suits, instead of one, would cover substantially same ground and occasion unnecessary expense.

2. MONOPOLIES ☞24(2)—BILL—SUFFICIENCY.
    Allegations that control obtained through stock ownership of certain fish dealers violated Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), and supplementary acts, held sufficiently broad to charge violation of Clayton Act, which supplements Anti-Trust Act.

3. COURTS ☞347—FEDERAL COURTS—BILL—AMENDMENT.
    Under equity rule 19 (38 Sup. Ct. xxiii), relating to amendments, a bill brought under Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), and supplementary acts, may be amended to also seek relief under Clayton Act, where that phase of case was fully covered at trial.

4. MONOPOLIES ☞20—CLAYTON ACT.
    The Boston Fish Pier Company, by acquiring stock of 25 wholesale fresh fish corporations and thereafter conducting the business so that

competition between them ceased, violated Clayton Act, § 7 (Comp. St. § 8835g), and combination should be dissolved.

**5.** MONOPOLIES ⬥20—CLAYTON ACT.

The Bay State Fishing Company, by acquiring stock of 8 wholesale fresh fish corporations and eliminating competition between them, violated Clayton Act, § 7 (Comp. St. § 8835g), and combination must be dissolved.

**6.** MONOPOLIES ⬥17(1)—SHERMAN ANTI-TRUST LAW—VIOLATION.

Action of Boston fish dealers in securing control of a fish pier and fish exchange, which enabled them to centralize and control the interstate trade in fresh fish, *held* to violate the Sherman Anti-Trust Law (Comp. St. §§ 8820–8823, 8827–8830).

**7.** MONOPOLIES ⬥24(2)—SHERMAN ANTI-TRUST LAW—REMEDY.

The Boston Fish Market Corporation, although operating a fish pier so as to unduly restrain trade in violation of Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), will not be dissolved, if it opens the pier to all persons desiring to purchase fish under reasonable regulations.

**8.** MONOPOLIES ⬥24(2)—SHERMAN ANTI-TRUST ACT—REMEDIES.

The New England Fish Exchange, which provides a place in Boston where fishermen and dealers may transact business, will not be dissolved because it violates the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), if its rules are reformed, so as to permit all applicants to become members under reasonable regulations.

**9.** MONOPOLIES ⬥17(1)—FISH EXCHANGE—CHARGE ON SALES.

Since the New England Fish Exchange is an agency for common benefit of those doing business there, burden of maintaining it should be fairly apportioned, and fishermen should not be charged a higher fee on their sales than is necessary to pay expenses and reasonable return on money invested.

**10.** MONOPOLIES ⬥17(1)—RESTRAINT OF TRADE—FISH EXCHANGE.

A rule of the New England Fish Exchange requiring fishermen to pay a certain percentage on the highest bid made for their fish, although the bid be not accepted, tends to compel a sale, whether fishermen be satisfied with bid or not, and unreasonably restrains trade.

**11.** MONOPOLIES ⬥17(1)—RESTRAINT OF TRADE—FISH EXCHANGE.

A rule of the New England Fish Exchange assessing dealers a certain amount on fish purchased tends to increase price of fish, and unreasonably restrains trade.

**12.** MONOPOLIES ⬥17(1)—RESTRAINT OF TRADE—FISH EXCHANGE.

A rule of the New England Fish Exchange, which was construed to preclude commission men from selling fish, except to wholesalers doing business on the Exchange, unreasonably restrains interstate trade.

**13.** MONOPOLIES ⬥17(1)—RESTRAINT OF TRADE—FISH EXCHANGE.

A rule of the New England Fish Exchange, precluding commission men having privileges of the Exchange from selling to retailers, should be amended to allow sales to all dealers.

**14.** MONOPOLIES ⬥17(1)—RESTRAINT OF TRADE—FISH EXCHANGE.

The purchase and sale by the New England Fish Exchange of fish on its own account and for others unreasonably restrain trade.

**15.** MONOPOLIES ⬥17(1)—RESTRAINT OF TRADE—FISH EXCHANGE.

A rule of the New England Fish Exchange, providing that members shall not agree to divide purchases of fish until after purchase has been made, should be strictly enforced, since agreements to refrain from bidding would unreasonably restrain trade.

**16.** MONOPOLIES ⬥17(1)—RESTRAINT OF TRADE—FISH EXCHANGE.

Rules of New England Fish Exchange, limiting its privileges to wholesale fresh fish dealers, unreasonably restrain trade.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

17. MONOPOLIES ⟨⫘⟩17(1)—SHERMAN ANTI-TRUST ACT—VIOLATION.

The Boston Fish Pier Company, composed of 28 out of 40 fresh fish dealers and controlling the fish pier and fish exchange, violates Sherman Anti-Trust Act, §§ 1, 2 (Comp. St. §§ 8820, 8821).

18. MONOPOLIES ⟨⫘⟩17(1)—SHERMAN ANTI-TRUST ACT—VIOLATION.

The Bay State Fishing Company, composed of 8 out of 40 fresh fish dealers in Boston and a trawling fleet which is the only dependable source of supply at certain seasons, violates Sherman Anti-Trust Act, §§ 1, 2 (Comp. St. §§ 8820, 8821).

In Equity. Bill by the United States against the New England Fish Exchange and others. Decree ordered for the United States.

The United States Attorney and Edward F. McClennen, Sp. Asst. Atty. Gen., for the United States.

Blodgett, Jones, Burnham & Bingham and Addison C. Burnham, all of Boston, Mass., for New England Fish Exchange and other defendants.

Henry F. Hurlburt and Arthur P. French, both of Boston, Mass., for defendant Bay State Fishing Co. and others.

Charles T. Gallagher, Albert E. Pillsbury, Gaston, Snow & Saltonstall, and Nason & Proctor, all of Boston, Mass., for various defendants.

Before BINGHAM and JOHNSON, Circuit Judges, and ALDRICH, District Judge.

BINGHAM, Circuit Judge. This is a bill in equity, brought June 21, 1917, by the United States to prevent the defendants named in the margin [1] (all of whom are engaged in or connected with the wholesale fresh fish business) from further violating the act of Congress approved July 2, 1890 (26 Stat. 209 [Comp. St. §§ 8820–8823, 8827–8830]), and commonly known as the Sherman Act, and "acts supplementing such act," by combining and conspiring to monopolize and to restrain, and from monopolizing and restraining, a part of the trade and commerce among the several states in the fresh fish industry of New England, and particularly in that class of fresh fish known as "ground fish" and certain migratory or seasonable fish, of which mackerel is an example. The particular provisions of the Sherman Law of

[1] The New England Fish Exchange, Bay State Fishing Company, F. J. O'Hara & Co., Atlas Fish Company, Boston Fish Market Corporation, Boston Fish Pier Company, Commonwealth Ice & Cold Storage Company, Rush Fish Company, Coleman Son Company, Baker, Boise & Watson Company, Watts & Cook, Incorporated, John R. Neal Company, Taylor & Mayo Company, Haskins Fish Company, Warren Fitch Company, Star Fish Company, Henry & Close Company, Boston Fish Company, F. E. Harding Company, Arnold & Windsor Company, Story-Simmons Company, John Burns Company, E. A. Rich Company, Bay Fish Company, George M. Ingalls Company, Bunting & Emery Company, Whitman, Ward & Lee Company, H. A. Rich Company, Williams Bros. Fish Company, Cassius Hunt Company, Gloucester Fresh Fish Company, Atlantic & Pacific Fish Company, J. Adams & Co., Incorporated, B. F. Phillips Company, P. H. Prior Company, Freeman & Cobb Company, Booth Fisheries Company, Wm. Haskell Company, Shore Fish Company, Ocean Fish Corporation, William J. O'Brien, Daniel J. O'Brien, Nicholas L. Fulham, John J. Herbert, Ernest F. Rich, Edwin S. Goodspeed, Frank C. Goodspeed, Oliver C. Lombard, Edgar F. Curtis, and Alvin G. Baker.

which the acts set forth in the bill are alleged to be in violation are found in sections 1 and 2 (Comp. St. §§ 8820, 8821), and it is claimed that some of the alleged offending acts are also in violation of section 7 of the Clayton Act of October 15, 1914 (38 Stat. 731, c. 323 [Comp. St. § 8835g]).

The New England Fish Exchange is a Maine corporation, and was formed in the fall of 1908. All the wholesale fresh fish dealers then doing business in Boston, 44 in number (since reduced to 40), became members of the Exchange by the purchase of a share of its stock. At the time of the organization of the Exchange, the fish business at Boston was conducted at T Wharf and on Atlantic avenue and Commercial street, in the neighborhood of T Wharf. April 1, 1914, the business was removed to its present location at South Boston, known as the Boston Fish Pier. The Exchange was conducted at T Wharf from the time of its organization down to April 1, 1914, when it also was transferred to the Fish Pier.

The Bay State Fishing Company is a Maine corporation. It was organized in 1916, and took over the steam trawler fishing fleet of the Bay State Fishing Company of Massachusetts and 8 of the 40 dealers then members of the Exchange. These 8 dealers were Watts & Cook, Incorporated, John R. Neal Company, John Burns Company, Story-Simmons Company, Incorporated, H. A. Rich Company, B. F. Phillips Company, L. B. Goodspeed Company, and Alvin G. Baker.

The Boston Fish Pier Company is a Massachusetts corporation. It also was formed in 1916, when it took over 28 of the 40 dealers on the Exchange. It owns a control of the stock of the New England Fish Exchange, and through direct and indirect ownership, a control of the Boston Fish Market Corporation. The 28 dealers in the Boston Fish Pier Company are E. A. Rich Company, Cassius Hunt Company, Williams Bros. Fish Company, Arnold & Windsor Company, F. E. Harding Company, Hasking Fish Company, Atlantic & Pacific Fish Company, Baker, Boise & Watson Company, Freeman & Cobb Company, George M. Ingalls Company, Henry & Close Company, J. Adams & Co., Incorporated, P. H. Prior Company, Warren Fitch Company, Whitman, Ward & Lee Company, Ocean Fish Company, Star Fish Company, Coleman Son Company, Bay Fish Company, Taylor & Mayo Company, Rush Fish Company, Shore Fish Company, F. J. O'Hara & Co., Atlas Fish Company, Ernest F. Rich, doing business as A. F. Rich & Co., Lombard & Curtis, Fulham & Herbert, and the Boston Fish Company.

The Boston Fish Market Corporation is a Massachusetts corporation. It was organized by the dealers in 1910, with a view of acquiring a new location for the fish business, and holds, as lessee of the state of Massachusetts, a long-term lease of the premises at South Boston, where the Fish Pier is located and where the fish business is now conducted; the defendant dealers being sublessees.

The Commonwealth Ice & Cold Storage Company was organized in 1910 by the dealers to operate a cold storage plant, and since 1914 has occupied for this purpose certain premises set apart at the Fish Pier as sublessee of the Boston Fish Market Corporation. It is controlled

by the Boston Fish Market Corporation, which owns a majority of its common stock.

The four remaining defendants have locations on the Fish Pier as sublessees of the Boston Fish Market Corporation, where they do a wholesale fresh fish business. They are William J. and Daniel J. O'Brien, copartners under the name of R. O'Brien & Co., Booth Fisheries Company, Bunting & Emery Company, and Gloucester Fresh Fish Company; the three latter being Massachusetts corporations.

The William Haskell Company was a wholesale concern formerly doing business on the Fish Pier. It is alleged in the bill that it was acquired by the Boston Fish Pier Company, but this is not correct. It has gone into bankruptcy and out of business.

For a series of years prior to 1908, the fresh fish business at Boston was conducted at T Wharf. During this period some of the dealers had places of business upon the wharf, and others were accommodated at different points on Atlantic avenue and Commercial street. The supply of fish was brought in by fishing schooners, having been caught at fishing grounds east and northeast of the New England coast. The fleet engaged in this business consisted of 136 schooners. The fishermen connected with the schooner fleet fish from dories with hand trawls. During the latter part of conducting the business at T Wharf, fishing by steam trawlers was introduced, and the supply of fish was thus augmented.

T Wharf was held under a lease by the T Wharf Fish Market Corporation, at a rental of some $35,000 a year and taxes, and such of the dealers as had places of business upon the wharf occupied them as subtenants of the Market Corporation. The wholesale dealers on Atlantic avenue and Commercial street were permitted to make use of T Wharf for obtaining supplies of fish, and some 5 or more retailers were allowed to go there for a like purpose. The revenues of the T Wharf Fish Market Corporation consisted of the rents received from tenants, the sums collected from the other dealers for storage of hand carts, and wharfage charges and charges for scales paid by the fishermen.

Prior to 1908 the dealers and others purchased their fish from the captains, either on the cap log of the wharf or elsewhere, as they saw fit. As a rule the sales were at auction on the wharf and of an entire trip of a given kind of fish. Many abuses sprang up, detrimental alike to the fishermen and the dealers. In 1908 the dealers, with the approval of the captains of the fishing schooners, organized the New England Fish Exchange and put it into operation on T Wharf. One of the purposes of its organization was to improve the methods of conducting the business upon the wharf. The approval of the captains was indicated in a document referred to in the record as the "Captains' Agreement." Counsel for the government contend that by it the captains bound themselves to bring all their fish to T Wharf to sell upon the Exchange. But an examination of the document discloses that its fair meaning is, not that they bound themselves to bring all their fish to the wharf to sell on the Exchange, but that they were

willing to offer for competitive bidding on the Exchange such fish as they brought there, and to abide by the proposals therein made by the dealers in the nature of rules and regulations governing the transaction of business on the Exchange.

The authorized capital stock of the Exchange was 50 shares, of $100 each, and 44 dealers, who comprised substantially all the wholesale fresh fish dealers then in Boston, each purchased a share of the stock. Rules for the conduct of the business on the Exchange were adopted, which were in substantial accord with the proposals stated in the document called the "Captains' Agreement." Under these rules the business between the fishermen and the dealers was transferred from the cap log and elsewhere on the wharf to a room provided for the Exchange, where the captains were required, on the opening of the Exchange, to offer their fish for competitive bidding by the dealers. The captains were precluded from selling fish on the wharf outside of the room of the Exchange, except fish for salting; and a like rule applied to dealers in the purchasing or engaging fish at the wharf. The captains, having offered their fish on the Exchange, could withdraw it if they were not satisfied with the bids which they received, and offer it later on the Exchange or take it elsewhere. The fishermen paid the T Wharf Fish Market Corporation a wharfage charge of 30 cents per 1,000 pounds; they also paid the Exchange a charge of 1 per cent. on the selling price of their fish. In return for the latter charge the Exchange, on its part, undertook to keep a record of the transactions on the Exchange, and to pay each captain the price agreed upon with the dealer for his fish on receiving a card showing that the captain had delivered to the dealer the fish that the latter had bought. The Exchange also established a recognized cull and quality of fish, and provided means for settling disputes between the captains and the dealers and carrying their settlements into effect.

The result was that the trading in all fish brought in by vessels to the wharf, except fish for salting, had to be carried on in the room of the Exchange, and the only parties having access there were dealers who were members of the Exchange or their representatives, and persons who were not members, but to whom buyer's tickets were issued.

During the nine years of the Exchange the average annual amount received by it as fees charged the captains was $31,690, and the annual average sum received by it during this period for other fees and charges to members, buyers, and commission men was a little rising $9,000, making the average income of the Exchange over $40,000 a year. Its average expenses were a little under $20,000 a year.

In 1909, by a vote of the directors of the Exchange, it was provided that no more stock should be issued, and its by-laws provided that members desiring to dispose of their stock should first offer it for sale to the Exchange, and thereafter the stock of 4 members was purchased by the Exchange, reducing the number to 40.

Before the Exchange was formed, the dealers had made an effort to raise funds by voluntary contribution to secure a new site at which to conduct the business. This, however, failed, and in 1908, in order

to secure and develop a location for the conduct of the fish business, the Exchange adopted a rule by which those dealing on the Exchange, whether as members or by virtue of buyer's tickets, were required to pay an assessment of a given amount per pound on fish of certain classes, including ground fish, bought by them. The assessment on ground fish was a quarter of a cent a pound and on other fish classified for assessment it varied from one-eighth of a cent to a cent. The assessment on ground fish remained at a quarter of a cent a pound until October 5, 1918, nearly a year after this suit was brought, when it was abolished. This assessment was imposed, not only on the fish landed at Boston and sold by the captains on the Exchange, but on all that bought from the commission men on the Exchange which they had obtained by purchase or consignment, and which had been landed at other ports on the New England coast and shipped to them by rail or water.

As above stated, this assessment began in 1908, but not until the latter part of that year, and excluding the sums paid in 1908 and in January and February, 1918, the amount collected from January 1, 1909, to January 1, 1918, was a little more than $3,100,000; but the amount of money held by the Exchange at any one time was much less, the largest amount being $608,945.40. The reason for this was that 40 per cent. of the assessment secured from the stockholder members was paid back to them by the Exchange at the expiration of each three months. The remaining 60 per cent. assessed against them was held as an investment or trust fund, and was represented by notes given by the Exchange to the members and running for a period of five years. There were some five retail dealers having buyer's privileges on the Exchange, and the fish bought by them, of the classes subject to assessment, were assessed at the same rate as were like classes of fish when bought by the dealer members. In the case of these retail buyers 60 per cent. of the assessment was distributed to them at the expiration of the three-month periods; the remaining 40 per cent. was not returned, but was credited to the buyer's ticket account, and went into the treasury of the Exchange as a profit.

When the Exchange was formed, T Wharf was occupied under a lease expiring April 1, 1914, and it was expected that payment for the new location would be required by that date. The original by-laws, rules, and regulations were drawn with a view to the payment of the trust fund to the dealers at that time. Less than $600,000 of the assessment was used by the dealer members in the development of the property at the Fish Pier through the purchase of stock in the Boston Fish Market Corporation and of the Commonwealth Ice & Cold Storage Company. Votes were passed by the Exchange in March and June preceding and following April 1, 1914, to continue the assessment, and it was imposed and collected down to April 5, 1918, when it was abolished.

By April 1, 1914, the business conducted at T Wharf had been transferred to the Fish Pier at South Boston. It had been expected that this would take place six months earlier, but, the completion of the buildings on the Fish Pier having been delayed, this expectation was

not realized. In September, 1910, the state of Massachusetts, acting by its board of harbor and land commissioners, entered into an agree-ment with the Boston Fish Market Corporation to lease to it a certain parcel of the Commonwealth Flats at South Boston and to erect thereon a pier for its uses. The pier to be erected by the state was to be 1,200 feet long and 300 feet wide, and the Market Corporation was to erect thereon, prior to October 1, 1913, buildings of concrete or brick, suitable for the fish business, costing not less than $400,000. The buildings and permanent structures erected by the lessee were to become the property of the lessor at the expiration of the term of the lease or extensions thereof. The lease was to run for the term of 15 years, beginning October 1, 1913, at a yearly rental of $35,000, with the right in the lessee to extend the lease for a period of 15 years from October 1, 1928, on the same terms and conditions, except that the rental for the additional term was to be $45,000. The lessee was also to pay the "annual taxes assessed upon the premises leased, or any interest, whether of the lessor or lessee therein."

In December, 1913, the state of Massachusetts entered into a further agreement with the Boston Fish Market Corporation whereby it was provided that in case the Market Corporation, prior to the 1st day of October, 1943, had erected or caused to be erected buildings of concrete or brick, etc., on the leased premises costing not less than $1,000,000 and did not impose a wharfage charge on vessels admitted to discharge fish at the pier of more than 30 cents per 1,000 pounds of fish, or unfairly discriminate between fishing vessels or classes of fishing vessels with reference to their discharge, the lessee should have the right to extend the lease for a further period of 15 years from October 1, 1943, and for a still further period of 15 years from October 1, 1958, on the terms and conditions of the original lease, except that the rental for such additional periods should be fixed at an amount equal to 5 per cent. of the estimated value of the leased premises (exclusive of structures and improvements which had been placed by the lessee, its tenants, or licensees, thereon) as of a date 18 months prior to the commencement of each of said additional periods.

The Boston Fish Market Corporation expended or caused to be expended in the erection of permanent structures on the pier $1,300,-000. The taxes assessed upon the property were $37,211.20 in 1914, and they were thereafter increased, until in 1918 they reached $52,-609.92.

The Boston Fish Market Corporation in 1912, before its entry upon the construction of the buildings upon the pier at South Boston, obligated the dealers to take specific stores to be built upon the pier on a 10-year lease. An opportunity was given to all of the wholesale dealers who were members of the Exchange to take stores, and all excepting the Hub Fish Company and the Hamilton Estate did so commit themselves. A flat rent was fixed on these stores, and the dealers who were prepared to commit themselves were then given an opportunity to bid a bonus on the rental for a choice of location, which bonus was added to the rental. Having procured these commitments, the Boston Fish Market Corporation then built 45 stores on the two

sides of the pier. The buildings comprising these stores occupied all the available space on the pier, except what was required for an administration building and for the cold, storage plant of the Commonwealth Ice & Cold Storage Company.

When the business was transferred in 1914 from T Wharf to the Fish Pier, all of these stores but one were taken by the wholesale fresh fish dealers, the New England Fish Company, and a concern by the name of Snow & Parker. The vacant store was subsequently let to the Prior-Hamilton Company, wholesale dealers. Other stores were erected on Northern avenue, which led past the entrance to the pier. The stores erected on the northeasterly side of the avenue backed up to the water at the head of the docks to the pier. These stores were primarily intended for the shell-fish dealers. Some stores were also erected on the opposite or southwesterly side of the avenue for trade uses ancillary to the wholesale fresh fish business. Three of the stores on the water side of the avenue have been leased since the dealers transferred their business from T Wharf; and three or more of the stores on the southwesterly side of the avenue have been let. The leases of these stores contain a restriction prohibiting the lessees from doing a wholesale fresh fish business.

In addition to the dealer members having privileges on the Exchange, there were 13 other dealers who held such privileges by virtue of buyer's tickets issued by the Exchange; and to entitle them to the buyer's tickets they had to be either tenants on the pier or obtain trading privileges from the Boston Fish Market Corporation. Five of these 13 were large retail dealers, 5 bought for salting and smoking, and the balance for general purposes. There was also a buyer's ticket issued annually to one Pickert during the mackerel season. The buyer's tickets were issued for a month and were revocable at the will of the Exchange. The trading privileges on the pier were issued to licensees for a like term, and were revocable at the will of the Fish Market Corporation. By the new rules a retailer is not entitled to be admitted to buying privileges on the Exchange unless he can qualify as a wholesale fresh fish dealer, meaning thereby one who conducts "a business not less than fifty (50) per cent. of which in money value is the selling of fresh fish to others who are retailers, and conducting it separate and apart from any retail store."

There were also 18 commission men who took from the Boston Fish Market Corporation leases of offices in the administration building on the pier. These leases were "for the purpose of conducting an office only for the prosecution on its own account of a commission business in fish (exclusive of fish livers) which [were] landed outside of the port of Boston and sold by the lessee to wholesale fresh fish dealers. The term 'commission' [was] not [to] be construed as precluding the lessee from itself buying said fish so landed for sale, providing the same [was] sold to wholesale fresh fish dealers, but the leased premises [were] under no circumstances [to] be used for the carrying or storage of fish." The commission men, by the rules of the Exchange, were required to procure admission cards to the sales room of the Exchange, and to pay therefor $50 for any one member

of a firm and $40 for each salesman, to entitle them to sell fish to members of the Exchange, and, having procured such admission cards, they were required to offer for sale each day in the salesroom of the Exchange, at 7 a. m., all fish known to be due to arrive; but where fish had been refused by buyers on account of its condition, or fish had arrived of which no previous notice had been received, they could sell to members of the Exchange at other places, but to members of the Exchange only. In the rules of the Exchange that became effective November 11, 1918, the rule as to the sale of fish by commission men was made to read as follows:

"All fish to be sold by commission dealer members as fresh fish to members of the Exchange known to be due to arrive shall be offered for bids each day at the salesroom of the Exchange at the opening of business."

Out of the sums received by the Exchange from buyer's tickets, seller's tickets, the 40 per cent. of the assessment paid by the nonmember dealers and credited to the ticket account, and the charge to captains of 1 per cent. of the amount of their sales, it paid in dividends on each $100 share of its stock during nine years $1,800, or an average of $200 a year, and has a surplus sufficient to permit of a distribution of $2,000 to each shareholder, making in all an average annual income during this period of about $420 a share.

After the removal of the business from T Wharf to the Fish Pier, the captains were still required to pay to the Exchange 1 per cent. on the amount of their sales down to November 11, 1918, when the charge was reduced to one-half of 1 per cent. They were also required to pay the Boston Fish Market Corporation a wharfage charge of 30 cents per 1,000 pounds of fish, and an additional charge for the use of scales provided by the Market Corporation. The sum derived from these last two sources was something over $35,000 a year.

Cod, cusk, hake, haddock, and pollock, although not generally known to the consumer as ground fish, are so known to the trade. They are the most important fresh fish food in the northeastern part of the United States, and form a distinct trade class. They are not caught to any extent for consumption as fresh fish in the United States, except in Atlantic waters east and north of New England, and the trade in them as fresh fish is largely confined to the New England states, New York, New Jersey, and Pennsylvania, although to some extent the trade extends further west and south. They are the staple fresh fish food in these states. The only other fish that comes into the New England market for sale fresh in any relatively considerable quantities are halibut, salmon, and in the summer time mackerel. Ground fish are a medium priced fish as compared with the higher priced fish, such as salmon, mackerel, halibut, and blue fish, and the inferior or low-priced fish, such as whiting.

The control of the fresh ground fish trade in the United States is on the Fish Pier at Boston. It is the only market to which is brought with reasonable regularity a quantity sufficient to approach an adequate supply. There is landed at Boston annually from boats about 100,000-000 pounds of all kinds of fresh fish, of which about 83,000,000 pounds are ground fish; there are shipped into Boston annually for sale from other ports about 69,000,000 pounds of all kinds of fresh

fish of which from 30,000,000 to 39,000,000 pounds are ground fish; and substantially all of this ground fish, whether shipped in or landed at Boston from boats, goes through the Exchange on the Fish Pier. The amount landed at other places in Boston is about 1,500,000 pounds and is devoted to local consumption. The price charged for ground fish on the Fish Pier at Boston is the basis for prices charged at other markets, and to a great extent controls those prices. New York is the next largest fresh fish distributing point in the United States, and deals in about 26,000,000 pounds of fresh ground fish. For its ground fish supply, however, it is largely dependent on Boston, as it receives about 20,000,000 pounds of this class of fish from Boston. The exportation from Canada of fresh ground fish to the United States was, in 1916, a little rising 2,500,000 pounds, and in 1917 exceeded by but a little 5,000,000 pounds. What part of this, if any, is used for canning or salting, the record does not show. The amount of fresh ground fish landed at Portland, Me., annually varies from 12,-000,000 to 20,000,000 pounds. About 5,000,000 pounds of this goes into canning, and of the remainder about one-half is consumed in the local trade, nearly a quarter goes to the Fulton Market in New York City, and a fifth to the Boston Fish Pier. It appears from the government reports that in 1908 there was landed in Massachusetts and Maine 84 per cent. of the cod, 99 per cent. of the haddock, 100 per cent. of the hake, and 98 per cent. of the pollock for the entire United States; the states of Washington and California supplying 7 per cent. of the cod, which was used for salting exclusively. It is estimated, and we think conservatively, that Boston controls at least 95 per cent. of the interstate trade in fresh ground fish, all of which is handled at the Fish Pier, and that from 70 to 80 per cent. of all the fresh fish handled there is sold in interstate commerce.

Early in 1916 an effort was made to organize all of the dealers at the Fish Pier into a single corporation and to conduct the business through those dealers. This effort resulted in the formation of the Boston Fish Pier Company in October, 1916. Soon after this project was started, outside promoters undertook to bring about another organization of a like character among the dealers, combining with it an independent source of supply. The Bay State Fishing Company of Massachusetts then owned a fleet of 9 trawlers bringing fish to the Fish Pier for sale. This was the only trawler fleet then in existence in these waters. It furnished from a quarter to a third of the entire supply of fish landed at Boston, and during a large part of the winter months the only dependable supply. The latter project likewise contemplated the acquisition of all the dealers on the Fish Pier in conjunction with the supply furnished by the trawler fleet, and resulted in the formation of the Bay State Fishing Company of Maine in June, 1916. It is contended on the part of the Boston Fish Pier Company that the Bay State Fishing Company was first projected and that its own organization was later entered upon as a matter of self-defense, but we are unable to find that this was the situation. It seems rather that the undertaking that resulted in the formation of the Boston Fish Pier Company was first started, and thereafter it was a race

to see which would accomplish its purpose in acquiring all the dealers. The Bay State Fishing Company acquired the trawler fleet, 8 of the dealers, 2 halibut companies, and 2 commission houses, and the Boston Fish Pier Company acquired 28 dealers and 1 commission house.

The form pursued in the acquisition of the 28 independent dealers by the Boston Fish Pier Company was as follows: Each of the concerns sold to the Fish Pier Company its business, good will, and assets, except its share of stock in the New England Fish Exchange, a share of the common stock in the New England Fish Company, a share of stock in the Boston Fish Market Corporation, and its lease of the store on the Fish Pier. The Boston Fish Pier Company took over the dealers as employés. The capital stock of each concern was reduced to 30 shares, and the shares were transferred to the Boston Fish Pier Company. These concerns, having retained their shares of stock in the New England Fish Exchange and their leases on the pier, thereafter acted in conjunction with the Boston Fish Pier Company and with each other in the conduct of the fish business, and all competition between them ceased.

The method pursued by the Bay State Fishing Company of Maine in taking over its 8 dealers was as follows: It bought outright the stock of the John R. Neal Company and the L. B. Goodspeed Company. It organized the corporation known as A. G. Baker, Incorporated, a Massachusetts corporation. It also organized the B. F. Phillips Company of Maine, Watts & Cook, Incorporated, of Maine, Story-Simmons Company, Incorporated, of Maine, John Burns Company of Maine, and the H. A. Rich Company of Maine. Alvin G. Baker then entered into an agreement with A. G. Baker, Incorporated, whereby he sold to it his merchandise, furnishings, and fixtures on the premises occupied by him at No. 1, Boston Fish Pier, the good will of the business there conducted, the lease of the premises, "the privilege which goes with or is attached to his membership in the New England Fish Exchange, and the right to operate and do business through said Exchange"; also "all dividends which may hereafter come due to him from the assessment fund, so called, of said Exchange, reserving, however, the ownership of the certificate of membership or stock in said Exchange, and all dividends which may hereafter be declared on said stock"; also the buying privileges in the New England Fish Company, and the right to use the name of A. G. Baker, Incorporated. The B. F. Phillips Company of Massachusetts made a like agreement and transfer to the B. F. Phillips Company of Maine, and each of the other Massachusetts corporations made like agreements and transfers to their respective Maine corporations. The stock of the new corporations was transferred to the Bay State Fishing Company of Maine, the individual dealers became its employés in the conduct of the fish business through the various corporations, and all competition between the 8 dealers came to an end.

In the bill it is alleged (page 22) that the Bay State Fishing Company is in itself a monopoly in restraint of trade. It is also alleged (page 23) that the Boston Fish Pier Company is likewise a monopoly in restraint of trade. It is further alleged (pages 24, 25) that

these companies "have now entered into an agreement or understanding with one another governing all dealings on said Exchange," involving the maximum prices at which fish is to be bought on the Exchange and the minimum prices at which it shall be resold in interstate commerce. In the prayer of the bill it is asked that the Boston Fish Pier Company may be declared an unlawful combination in restraint of trade and dissolved, and that the Bay State Fishing Company may also be declared an unlawful combination in restraint of trade and dissolved.

[1] In view of this, the defendants contend that unless the government establishes by its proof that these two companies have entered into an agreement or understanding with one another governing all dealings on the Exchange, and in particular those relating to fish bought on the Exchange to be resold in interstate commerce, the relief asking for the dissolution of these individual companies in the prayer of the bill should not be granted; that in the absence of the foregoing allegation, and proof establishing the combination between these companies, the bill would present distinct grounds of complaint against different defendants, which would not be permissible; that the only relief that properly can be granted is the dissolution of the combination, if any, between the Bay State Fishing Company and the Boston Fish Pier Company, and not a dissolution of either or both of these companies; and that to dissolve these companies would be to permit the joinder of three different causes of action in a single bill. They rely in support of their contention on the decision in United States v. Reading Co., 226 U. S. 324, 372, 373, 33 Sup. Ct. 90, 57 L. Ed. 243.

That case was decided in December, 1912, prior to the adoption of the new equity rules on February 1, 1913, wherein the practice in equity cases was very materially changed. In these rules (rule 26, 201 Fed. v, 118 C. C. A. v) it is provided that:

"The plaintiff may join in one bill as many causes of action, cognizable in equity, as he may have against the defendant. But when there are more than one plaintiff, the causes of action joined must be joint, and if there be more than one defendant the liability must be one asserted against all of the material defendants, or sufficient grounds must appear for uniting the causes of action in order to promote the convenient administration of justice. If it appear that any such causes of action cannot be conveniently disposed of together, the court may order separate trials."

According to this rule, if the circumstances show that the administration of justice may be promoted by joining different defendants in a single bill of complaint, although the liability asserted is not joint, it may be done; and it seems to us that, if circumstances could ever exist where the rule would be applicable, they do in this case. All the transactions complained of relate to the conduct of the fish business on the Exchange through a series of years, and are so interwoven and connected that it would put the parties to unnecessary trouble and expense if they were required to litigate three suits, instead of one, all of which would cover substantially the same ground. We think, therefore, that we may properly deal in this proceeding with the question of dissolution of these corporations, if in other respects the law and the facts justify us in so doing.

It is conceded on the part of the government that there is no evidence from which it can be found that, since the formation of the Boston Fish Pier Company and the Bay State Fishing Company, these corporations have entered into a combination for fixing the maximum prices to be paid for fish on the Exchange or the minimum prices at which it should be sold. It contends, however, that a combination exists between these companies through the Exchange. It is to be remembered in this connection that the Exchange was organized and put in operation back in 1908, long prior to the organization of these companies, and that their organizations were not and could not have been steps in furtherance of a general combination of the dealers then doing business on the pier. It may be and probably is true that, if the dealers in 1908 effected a combination through the Exchange, these companies have adopted it; but that does not make the organization of their respective companies steps leading up to that combination.

In this situation two questions are presented: (1) Whether, on the allegations of the bill and the proof produced, the Boston Fish Pier Company and the Bay State Fishing Company are each in themselves a combination in restraint of interstate trade, in violation of section 7 of the Clayton Act or the Sherman Law; and (2) whether the Exchange, inaugurated by the dealers in 1908, constitutes an unlawful combination in restraint of trade, which has, since 1916, been adopted and perpetuated by the Boston Fish Pier Company and the Bay State Fishing Company, as well as by the four remaining dealers on the pier.

[2, 3] As previously stated, this proceeding is brought to prevent the defendants from further violating the act of Congress approved July 2, 1890, known as the Sherman Act, and "acts supplementing such act." The Clayton Act of October 15, 1914, is an act supplementing the Sherman Act and other existing laws against unlawful restraints and monopolies, and is so entitled. In the bill (page 8) it is alleged that the Bay State Fishing Company "controls and causes to be operated for its own benefit, either through stock ownership or under agreements, the businesses" of its 8 members, and that the Boston Fish Pier Company "controls and causes to be operated for its own benefit, either through stock ownership or by agreements, the businesses" of its 28 defendant dealers; and while it is not specifically alleged in the bill that the consolidation of the 8 dealers in the Bay State Fishing Company and of the 28 dealers in the Boston Fish Pier Company restrains competition between the dealers in each of the respective companies, it does generally so allege, and we think that the allegations are sufficient to justify a consideration of the question whether the control acquired by these organizations over their respective dealer members was in violation of the Clayton Act. But, if this were not so, we see no reason why the plaintiff's application for leave to amend its bill as to this matter should not be granted. The subject was fully gone into at the trial by the introduction of evidence and the presentation of the views of counsel, and to allow the amendment will be in furtherance of justice and in no way affect

the substantial rights of the parties. Equity Rule 19 (33 Sup. Ct. xxiii).

That part of section 7 of the Clayton Act material to a consideration of this case reads as follows:

"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of two or more corporations engaged in commerce where the effect of such acquisition, or the use of such stock by the voting or granting of proxies or otherwise, may be to substantially lessen competition between such corporations, or any of them, whose stock or other share capital is so acquired, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce.

"This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. Nor shall anything contained in this section prevent a corporation engaged in commerce from causing the formation of subsidiary corporations for the actual carrying on of their immediate lawful business, or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of such subsidiary corporations, when the effect of such formation is not to substantially lessen competition."

[4] The evidence discloses that the Boston Fish Pier Company, in 1916, acquired the stock of 25 of the corporations doing business in interstate commerce as independent wholesale fresh fish dealers on the Fish Pier, and the assets and business of Ernest F. Rich, doing business under the name of A. F. Rich & Co., and the partnerships of Lombard & Curtis and Fulham & Herbert, the three latter concerns being wholesale fresh fish dealers engaged in interstate trade on the pier, and that it thereafter conducted the businesses of these dealers, and all competition between them ceased. We think the acquisition of these corporations was plainly in violation of the Clayton Act, and that their combination in the Boston Fish Pier Company must be dissolved.

[5] We also are of the opinion that the acquisition by the Bay State Fishing Company of the stock in the 8 corporations in its combination is likewise in violation of the Clayton Act. The fact that 5 out of 8 of the corporations whose stock was taken over by the Bay State Fishing Company were organized under the laws of Maine, to whom the Massachusetts corporations bearing the same names conveyed their businesses and assets, does not make the situation different than it would have been, and no less a violation of the Clayton Act, had it taken over the stock of the Massachusetts corporations directly. The respective Maine and Massachusetts corporations were in substance the same, and the effect of the formation of the Maine corporations and the taking over of their stock was to defeat competition between all of the subsidiary corporations. The combination of these corporations with the Bay State Fishing Company was therefore a violation of the Clayton Act and must be dissolved.

[6] It is contended on behalf of the government that the Exchange was put into operation by the dealers in 1908 for the purpose of enabling them to control the purchase and sale of fish on T Wharf and afterwards at the Fish Pier. It is conceded that an exchange is a proper instrumentality through which to conduct the business, provided

it is governed by rules and regulations that do not impose an undue restraint upon the trade, and that the trade conditions existing between the dealers and the fishermen in 1908 were such as to call for the introduction of an instrumentality of this nature. The contention, however, is that the purpose of the dealers in the institution of the Exchange and in the establishment of the rules and regulations that were adopted was to confine the flow of fish through the pier or T Wharf to themselves and to otherwise impose undue restraint upon the trade.

In discussing the question of the Exchange, it is necessary to take into account the situation existing at T Wharf and at the Fish Pier, for they were the places where, at different times, the Exchange was located, and a limitation upon the right to be admitted to do business upon the pier or the wharf necessarily limited and confined admission to the Exchange to such as had the right to do business upon the pier or wharf. Under the rules and regulations, so far as we are informed, those having the right to do business on the pier are permitted upon like terms to obtain admission to the privileges of the Exchange, and it is evident that this should be so in order to avoid undue discrimination. If the right to do business on the pier is unlawfully restrained by the denial of its privileges to dealers other than the defendants, it would follow that their exclusion from the Exchange was also without right.

The question on this branch of the case, therefore, is whether the situation as it existed at T Wharf, and later at the Fish Pier, was such as to render the exclusion of outside dealers from the privilege of going upon the wharf or pier to obtain a supply of fish from the captains and commission men unlawful.

The T Wharf Fish Market Corporation was a combination of wholesale dealers that held the lease of T Wharf. The Boston Fish Market Corporation was also a combination of wholesale dealers that later held the lease of the Fish Pier. These organizations were formed and the locations obtained with a view of centralizing the businesses of all the wholesale fresh fish dealers, first at T Wharf, and afterwards at the pier, and thereby creating a market for the purchase and sale of fresh fish (that could not otherwise have been created) and of a character that would induce the bringing of fish to these places for sale to the exclusion of other places.

Under the T Wharf Fish Market Corporation combination some 30 wholesale dealers became tenants on T Wharf and were accorded the privilege of dealing with the captains on the wharf without further expense than the rent which they paid for their stores, and some 13 or 14 other wholesale dealers and 5 or more of the large retail dealers were permitted to purchase fish on the wharf without charge, except for the storage of hand carts. With this body of buyers centralized on the wharf, the captains of 136 fishing schooners coming into Boston were induced, through the market thus created, to bring their catches to T Wharf for sale, and the trawler fleet of the Bay State Fishing Company of Massachusetts, which was later organized, was likewise induced to bring its catches there. The commission

men also were induced to a large extent to come there to offer for sale fish which had been consigned to them and landed at ports other than Boston. Having, through these means, diverted the flow of fish from other channels to T Wharf, the wholesale dealers then, with the approval of the captains, established the Exchange and limited its privileges to themselves and such other dealers as they saw fit to grant trading privileges on the wharf.

The transfer of the business from T Wharf to the Fish Pier did not alter the situation, further than that the new location afforded opportunity for centralizing a greater number of dealers engaged in the fish business, and made it doubly sure that fish caught in New England waters would be brought to the Fish Pier for sale, rather than to T Wharf or any other place. The result of the combined action of the dealers was that 83 per cent. of all the fresh fish and 95 per cent. of all the ground fish brought to Boston was landed at the Fish Pier, which gave absolute control to these dealers of all the fish passing through the pier and a predominating control of all the fresh fish dealt in throughout the North Atlantic states, rendering it impossible for an outside dealer to build up a business in interstate trade.

We think, therefore, that the defendant dealers, by combining in the manner above outlined, with a view to centralizing and controlling the flow of fish in interstate commerce and the acquisition of that control, violated the Sherman Law, and unduly and unreasonably restrained interstate trade in fresh fish.

[7, 8] But as the Boston Fish Market Corporation and the Exchange are facilities which may be operated for the good of the trade, by amending or eliminating the rules of the Exchange that place an undue restraint on the business, and by requiring the Boston Fish Market Corporation to open up the pier upon equal and reasonable terms to such dealers as may desire the privilege of doing business there, we think that the Boston Fish Market Corporation should not be dissolved, provided the pier is thus opened up, and that the Exchange should not be dissolved, provided its rules are reformed to meet the requirements necessitated by the opening up of the pier, and are otherwise amended in the respects hereinafter pointed out as imposing undue restraints upon the trade.

Under the rules of the Exchange the fishermen coming to the pier with fish for sale are required to offer all their fish, except fish for salting, in the room provided for the Exchange, and the dealer members and others having the privileges of the Exchange are precluded from purchasing or engaging fish landed at the pier, other than fish for salting, except on the Exchange. If the pier is opened up to outside wholesale and retail dealers, and they are accorded the privileges of the Exchange upon reasonable and equal terms, we do not see that such regulations would impose an undue or an unreasonable restraint upon trade; but we think that no rule of the Exchange or of the Fish Market Corporation should be adopted or enforced which would preclude wholesale or retail dealers from the privileges of

the Exchange and the pier, so long as they conform to reasonable rules and regulations.

[9, 10] Whether the charge of 1 per cent. to the captains on the selling price of their fish operated to restrain trade and increase the price of fish is, on the evidence, doubtful. It is plain, however, that the charge was unreasonable, and this is demonstrated by the fact that, after paying all expenses of the Exchange, the average annual income on a share of stock in the Exchange was $420, three-fourths or more of which came out of the charge to the captains. The Exchange being an agency instituted for the common good and benefit of those doing business on the pier, the burden of maintaining it should be fairly apportioned among those receiving its benefits. This charge has now been reduced to one-half of 1 per cent., and should be still further reduced if it should turn out that it produces, with the other income of the Exchange, more than its expenses and a reasonable return on the money invested. But in the new rules relating to this complaint there has been inserted a provision whereby a captain is required to pay one-half of 1 per cent. figured on the highest bid made, even though he has not accepted the bid and has withdrawn his fish. This, we think, is an unreasonable restraint, and operates to compel a captain to sell his fish, whether he is satisfied with the bid or not. This provision should be stricken from the rules and its enforcement restrained.

[11] The assessment imposed by the Exchange upon the dealers and traders on the Exchange of a quarter of a cent a pound on ground fish and of an eighth of a cent to a cent a pound on other classes of fish operated directly to increase the price of fish in interstate commerce and imposed an unreasonable restraint. Although the rule imposing this assessment has been abolished since the institution of this proceeding, it was in force at the time the suit was brought, and its reinstatement should be restrained.

[12] Under the old rules commission dealers doing business on the Exchange were required to offer for sale each day in the salesroom of the Exchange, at 7 a. m., all fish known to be due to arrive which had been landed at ports other than Boston and which had been sold or consigned to them for sale. This rule, as construed and enforced by the Exchange, precluded commission men from selling their fish to wholesale dealers other than those doing business on the pier, and was an unreasonable restraint of interstate trade. Since the institution of this suit the rule has been amended as herein previously set forth, and the restraint eliminated. The reinstatement of this rule should be restrained.

[13] As the rules now stand, commission men having privileges on the Exchange may sell their fish to wholesale dealers, whether they do business on or off the pier. They are, however, precluded from selling to retailers. This rule should be amended, so as to allow commission men having privileges on the Exchange to sell to all dealers, wholesale or retail.

[14] The Exchange has at different times engaged in the purchase and sale of fish on its own account and for others, but this practice

has been done away with by article 30 of the rules effective November 11, 1918. We see no objection to article 30 as it now stands. Any infraction of it or resort to the former practice should be restrained.

[15]. There has existed among the dealers a practice known as "splitting trips," whereby a given dealer would purchase a trip of fish at auction on the Exchange and then divide his purchase with other dealers. It is contended on the part of the government that in such cases the parties who were to share in the trip would agree in advance on the price to be bid, that a single bid would be made, and competition in bidding defeated, to the detriment of the captains. We think that the evidence shows that at times such agreements were made. In the new rules, however, it is provided that "a splitting of a trip or a portion of a trip between the purchaser and other members * * * shall not be agreed to or arranged until after the making of the purchase." Due enforcement of this rule will obviate the difficulty. The splitting of trips is beneficial to the smaller dealers, who often cannot handle an entire trip, and the captains prefer to sell all their fish as an entire trip, or the whole of a given variety of their fish to a single purchaser. If splitting is to be permitted, the provisions of the present rule should be strictly enforced, and any infraction of it restrained.

[16] All the rules of the Exchange limiting its privileges to wholesale fresh fish dealers, and prescribing the conditions upon which a dealer shall be regarded as a wholesale fresh fish dealer, should be abolished, and their enforcement restrained.

[17] It was strenuously insisted upon at the trial that the union of the 28 dealers in the Boston Fish Pier Company gave to that company such a predominance on the Fish Pier and control over the flow of fish there in interstate commerce that it was in itself an illegal combination in restraint of trade and offended the Sherman Act, as well as section 7 of the Clayton Act; and we think the evidence bears out the contention. Prior to the consolidation these 28 dealers had acted independently in the conduct of their businesses, and each had built up an interstate trade in fresh fish. They were tenants on the Fish Pier and members of the Exchange, through which the flow of fish passed. Each of the dealers owned a share of stock in the Exchange, and their 28 shares gave the Boston Fish Pier Company control of the Exchange. They also had substantial holdings of the common stock of the Boston Fish Market Corporation, which controlled the pier. The Exchange also had large holdings of the stock in the Boston Fish Market Corporation. This stock, together with that acquired from the dealers, gave the Boston Fish Pier Company control of the Boston Fish Market Corporation, which owned a control of the stock in the Commonwealth Ice & Cold Storage Company. This put the Fish Pier Company in a position where it could dictate what the rules of the Exchange should be and how it should be operated; also how the pier should be conducted, who should have trading privileges thereon, and who, from time to time, as existing leases expired, should become its tenants. Furthermore, it handled 58 per cent. of all the fresh fish dealt in on the pier and substantially that percent-

age of the ground fish. Its power of control became so great that, through a recent rule of the Exchange, it compelled the Bay State Fishing Company to offer its independent production (which consists of from a quarter to a third of all the fresh fish landed at the pier) for sale at auction on the Exchange or forfeit the membership of its dealers and its buyer's privilege on the Exchange. The acquisition of this power of control, due to combination and not to natural growth and development, we regard as in contravention of sections 1 and 2 of the Sherman Law.

[13] It is also contended that the combination in the Bay State Fishing Company of the 8 dealers and the independent source of supply furnished by the 9 trawlers acquired from the Bay State Fishing Company of Massachusetts was also in violation of the Sherman Law. This company has become the largest individual producer of fish on the Atlantic coast. Prior to the consolidation the 8 dealers were competitors in the purchase of fish on the Exchange and in marketing it in interstate commerce. After the consolidation it handled about 31 per cent. of all the fresh fish dealt in on the Exchange, and at certain seasons of the year practically all the ground fish. This was due to the fact that on many days through the winter months fish could be caught by the trawler fleet when it could not be by the schooners. Prior to the combination, the production of the trawler fleet was offered for competitive bidding on the Exchange to all the dealers. After its organization it was turned over to its 8 dealers, except so far as it saw fit to sell to other dealers on the Exchange. The Bay State Fishing Company had access to the Exchange through its dealer members and its buyer's privilege, which enabled it to bid at the auction sales on the Exchange. For a year or more prior to the adoption of the rule of the Exchange in 1918 requiring it, as a producer of fresh fish discharged from vessels at the Fish Pier, to offer its fish for competitive bidding on the Exchange, it had ceased to offer its fish on the Exchange, but had retained and exercised its right to bid upon other fish offered there for sale. Having its own source of supply and the right to bid upon other fish sold on the Exchange, it was in a position to bid on such fish in competition with the other dealers and thus raise the price. This gave it an undue control of the market during certain seasons of the year, and the evidence discloses that the power which it exercised was a menace to the trade, and likely to result in driving other dealers out of business or into its combination. We think, therefore, that the Bay State Fishing Company is a combination in unreasonable restraint of trade in interstate commerce, and that the combination which now exists, whereby it engages in the production and distribution of fresh fish, should be dissolved by restoring its 8 dealers to the competitive conditions under which they formerly did business on the pier and through the Exchange, and that the Bay State Fishing Company should be restrained from in any way interfering with or making use of the businesses and good will of the 8 constituent dealers in the marketing of fish.

A decree may be prepared according to the foregoing suggestions, which shall state the mode and manner in which the dissolutions and restraints above stated 'shall be effected; also enjoining the defendant dealers, or any of them, from in any manner combining in the conduct of their businesses, or in any way agreeing among themselves to raise or depress the price of fish to be bought or sold in interstate commerce; also enjoining the defendant dealers from enforcing any by-laws, rules, or regulations, either of the Boston Fish Market Corporation or of the Exchange, herein pointed out as imposing an undue restraint upon interstate trade; and there may be prepared and submitted for the consideration of the court such rules and regulations of the Exchange, and of the Boston Fish Market Corporation for the conduct of business on the Exchange, and the opening up of the pier to outside dealers as are not inconsistent with the conclusions reached in this opinion.

If the parties cannot agree upon the terms for opening up the pier and the Exchange, then the decree to be prepared may include a provision dissolving the Exchange and the Boston Fish Market Corporation and stating the mode and manner in which the dissolutions shall be effected..