COMMONWEALTH *vs.* PATRICK J. McHUGH & others.

Suffolk. February 7, 1950. — July 7, 1950.

Present: QUA, C.J., RONAN, WILKINS, SPALDING, & COUNIHAN, JJ.

*Monopoly. Fisheries. Labor and Labor Union. Jurisdiction,* Federal question, Maritime matters. *Interstate Commerce. Equity Jurisdiction,* Monopoly, Labor. *Admiralty. Contempt. Equity Pleading and Practice,* Removal to Federal Court, Motion to dismiss, Hearing of interlocutory matters with merits, Decree, Contempt proceedings, Jury trial. *Evidence,* Hearsay, Competency, Relevancy and materiality. *Words,* "Labor dispute."

There was no error in a denial by the Superior Court of petitions by the defendants for removal to the United States District Court of a certain suit by the Commonwealth under G. L. (Ter. Ed.) c. 93, § 3.

A so called "motion to dismiss and quash bill of complaint, subpoenae and orders of notice," filed by the defendants in a suit by the Commonwealth under G. L. (Ter. Ed.) c. 93, § 3, was improper practice.

There was no error in a suit in equity in ordering a demurrer, pleas and a petition for contempt for violation of a preliminary injunction to be heard with the merits.

There was monopolistic conduct in violation of the common law and of G. L. (Ter. Ed.) c. 93, § 2, on the part of members of a labor union of commercial fishermen manning most of the boats operating out of Massachusetts ports and employed on the lay system of compensation, where it appeared that the members combined to prevent or interfere with a free and fair market in the sale of fresh fish in Massachusetts by limiting the quantity of fish produced and fixing minimum prices for its sale through the adoption of certain votes, control of the selling of fish and other practices, and the imposition of penalties, and that they were able to enforce their policies through having "virtual con-

trol of the man power engaged on" such boats; and it was immaterial whether or not by their conduct prices had actually reached a level which by some standard could be pronounced unreasonable.

The provisions of G. L. (Ter. Ed.) c. 93, § 2, are applicable to members of labor organizations who engage in monopolistic practices forbidden thereby.

The Federal antitrust laws have not preëmpted the entire field of monopolies occurring in or affecting interstate commerce, and did not preclude a suit under G. L. (Ter. Ed.) c. 93, § 3, to restrain monopolistic practices conducted in violation of § 2 by a combination of members of a labor union of fishermen in connection with the marketing of fresh fish in Massachusetts, even though such practices occurred in or affected interstate as well as intrastate commerce.

A suit by the Commonwealth under G. L. (Ter. Ed.) c. 93, § 3, to restrain members of a labor union of fishermen, employed on the lay system of compensation, from combining to engage in certain monopolistic practices preventing or interfering with a free and fair market in the sale of fresh fish in Massachusetts in violation of § 2 did not involve a "labor dispute" and was not subject to c. 214, § 9A, inserted by St. 1935, c. 407, § 4.

The Federal fisheries coöperative marketing act did not preclude application of G. L. (Ter. Ed.) c. 93, §§ 2, 3, to certain monopolistic practices conducted, in connection with the marketing of fresh fish in Massachusetts, by a combination of members of a labor union of fishermen employed by the owners of fishing boats and paid on the lay system of compensation.

The mere fact that fish were caught in the sea did not make a maritime matter certain monopolistic practices engaged in by a combination of the fishermen on shore in connection with the marketing of the fish.

Jurisdiction to restrain under G. L. (Ter. Ed.) c. 93, §§ 2, 3, certain monopolistic practices on the part of a combination of fishermen in connection with the marketing of fresh fish was not taken away from the Massachusetts courts by the mere fact that one of the piers on which such fish were landed and sold stood on the bottom of Boston harbor below mean low water mark.

Reports of government agencies were hearsay and not admissible in a suit by the Commonwealth under G. L. (Ter. Ed.) c. 93, § 3, to restrain monopolistic practices on the part of a combination of fishermen in connection with the marketing of fresh fish.

In a suit by the Commonwealth under G. L. (Ter. Ed.) c. 93, § 3, to restrain members of a labor union of fishermen from engaging in monopolistic practices in violation of § 2, a final decree for the Commonwealth was ordered modified by this court by changing its phraseology so that it would enjoin the defendants from combining to do certain acts to prevent or interfere with a free and fair market in the sale of fresh fish; by omitting certain references to "fair market value"; and by including certain provisions so as to protect the rights of individual captains and separate crews, acting independently, respecting the sale of particular catches, to protect the rights of the defendants

to bargain collectively or strike in good faith for the primary purpose of improving their conditions, and not to prevent the defendants from complying with laws, treaties and conventions limiting the catching of fish: such decree, as modified, should be construed so as to accomplish effectively the object of the suit to stop monopolistic practices on the part of the defendants, but not in such a manner as to put the defendants in a position inferior to that of other working men respecting their general right to improve their conditions.

There was no error in a decree adjudging in contempt the defendants in a suit by the Commonwealth against members of a labor union of fishermen under G. L. (Ter. Ed.) c. 93, § 3, where it appeared that after the entry of a preliminary injunction restraining the defendants from combining to prevent a free and fair market in the sale of fresh fish the defendants voted, with intent to enforce their vote, to limit the production of fish so as to fix the prices thereof, and that they then knew of the injunction and that their vote was within its prohibition.

Remarks made by a judge in settling the terms of a preliminary injunction before it was issued by him were not admissible in evidence, in a subsequent contempt proceeding for alleged violation of the injunction, for the purpose of interpreting or qualifying its language or as bearing on the question whether the conduct of the alleged contemnors was contumacious.

The defendants in a suit by the Commonwealth under G. L. (Ter. Ed.) c. 93, § 3, not involving a "labor dispute," were not entitled to a jury trial in a contempt proceeding against them for alleged violation of a preliminary injunction.

BILL IN EQUITY under G. L. (Ter. Ed.) c. 93, § 3, filed in the Superior Court on February 14, 1947.

Petitions for removal of the suit to the District Court of the United States were heard by *Williams*, J., and *Brogna*, J. A motion to dismiss and quash, a demurrer, pleas, the merits and a contempt proceeding were heard by *Broadhurst*, J.

*H. Wise*, for the defendants.

*J. J. Kelleher*, (*L. E. Ryan*, Assistant Attorney General, with him,) for the Commonwealth.

QUA, C.J. This is an "action" brought by the Attorney General in the name of the Commonwealth under G. L. (Ter. Ed.) c. 93, § 3, against the officers and members of the Atlantic Fishermen's Union, a voluntary association, to restrain the defendants from continuing certain "acts, arrangements, combinations, and practices" described in the bill of complaint and alleged to be in violation of the common law and of c. 93, § 2.

Chapter 93, § 2, reads, "Every contract, agreement, arrangement, combination or practice in violation of the common law whereby a monopoly in the manufacture, production, transportation or sale in the commonwealth of any article or commodity in common use is or may be created, established or maintained, or whereby competition in the commonwealth in the supply or price of any such article or commodity is or may be restrained or prevented, or whereby for the purpose of creating, establishing or maintaining a monopoly within the commonwealth of the manufacture, production, transportation or sale of any such article or commodity, the free pursuit in the commonwealth of any lawful business, trade or occupation is or may be restrained or prevented; or whereby the price of any article or commodity in common use is or may be unduly enhanced within the commonwealth, is hereby declared to be against public policy, illegal and void."

An outline of the allegations of the bill sufficient for an understanding of the issues will now be stated: Fresh fish is an article or commodity in common use. The defendants assume "jurisdiction" over substantially all the commercial fishing out of Gloucester, Boston, and New Bedford and exercise control over the activities of the fishermen and the entire supply of fish in those areas, which constitutes substantially the entire supply for the Commonwealth. They have combined to control completely not only the catching but the marketing and price of all such fish in such a manner as to create a monopoly, suppress competition, and unreasonably restrain trade in violation of the common law and of G. L. (Ter. Ed.) c. 93, § 2, in a manner described in detail in the bill which may be summarized as follows: by operating a "selling room" at Gloucester, prescribing and enforcing rules and regulations governing the same, and determining who shall be admitted and whose bids shall be accepted or rejected; by requiring under penalty of fines and other disciplinary action that all fish brought into Gloucester on vessels manned by the defendants must be sold through the selling room, subject to the rules and

regulations of the defendants, and not sold elsewhere to dealers, so as to compel dealers to submit to the defendants' rules in order to obtain necessary supplies of fresh fish, thereby giving the defendants complete control over the entire supply of fresh fish coming into Gloucester and over its price and sale, creating a monopoly, and preventing the free pursuit of the lawful business, trade, or occupation of dealing in fresh fish; by unjustifiably excluding dealers in certain instances from the selling room and refusing to accept their bids, even though they were the highest, thereby depriving such dealers of supplies; by persuading, coercing, and inducing various captains of fishing vessels by intimidations and threats of fines, of shutting off their sources of supplies, and of preventing them from obtaining crews to refuse to sell their catches to the highest bidders, thereby preventing such dealers from obtaining supplies necessary to their business; by artificially raising the price of fresh fish through the promulgation of a rule prohibiting purchasers from deducting from the purchase price of fish more than five per cent for ice or "trash," regardless of the amount of ice or "trash" contained in the fish; by enforcing through fines upon captains and crews restrictions limiting the quantities of fresh fish which could be brought into the three ports named, thereby maintaining the price at unreasonably high levels; and by establishing the price at which fish could be sold at the New England Fish Exchange in Boston in order illegally to control the price of fish in Boston, in support of which fines and penalties will be imposed upon the crew and captain of any vessel that sells its catch for less than the price established by the defendants. By these acts the defendants have unduly enhanced the price of fish and have crippled the fish industry in a manner detrimental to the Commonwealth and the public.

1. The defendants, except one, filed a joint petition for removal of the cause to the United States District Court.[1]

---

[1] This was before the change in removal procedure brought about by the 1948 revision of the Judicial Code of the United States, Act of June 25, 1948, 62 U. S. Sts. at Large, 869.

The remaining defendant filed his separate petition. Both petitions were denied, and the action of the judge is reported to us. Notwithstanding these denials, the defendants presented the cause to the United States District Court, but that court remanded it to the Superior Court. *Commonwealth of Massachusetts* v. *McHugh,* 71 Fed. Sup. 516. For reasons included in the opinion of the District Court in that case, which we do not repeat here, we hold that there was no error in denying the petitions for removal. See further *Metropolitan Casualty Ins. Co.* v. *Stevens,* 312 U. S. 563; *Gully* v. *First National Bank,* 299 U. S. 109; *Atlantic Fishermen's Union* v. *Barnes,* 71 Fed. Sup. 927; *Lawrence Trust Co.* v. *Chase Securities Corp.* 292 Mass. 481.

2. The defendants filed a paper entitled "Motion to Dismiss and Quash Bill of Complaint, Subpoenae and Orders of Notice," wherein are set forth many alleged reasons for dismissing the bill. Such a pleading, apparently designed to usurp or duplicate the office of a demurrer or plea, was improper practice. *Rothstein* v. *Commissioner of Banks,* 258 Mass. 196. *E. S. Parks Shellac Co.* v. *Jones,* 265 Mass. 108, 110. *Tyler* v. *Boot & Shoe Workers Union,* 285 Mass. 54, 55. The motion is not in such form that it can be identified as in substance either a demurrer or a plea. The defendants also filed a demurrer and pleas. There was no error in denying the motion. The matters of defence to which it refers, in so far as they have substance and are argued, are raised and are considered in connection with the hearing on the merits.

3. The defendants filed a demurrer and two pleas. The pleas are for the most part alike, except that one is called a plea in abatement and the other a plea in bar. All, or practically all, of the matter set up in each of them is matter in bar. The court ordered the demurrer and pleas to be heard with the merits. It made a similar order in the matter of a petition for contempt brought by the Attorney General against the defendants for alleged violation by the defendants of a preliminary injunction issued in this cause. All these matters were heard together. There was no error in

adopting this procedure. *Pearson* v. *Mulloney,* 289 Mass. 508, 510–511. *Potter Press* v. *C. W. Potter, Inc.* 303 Mass. 485, 491–492.

4. In so far as the demurrer raises questions of form we think it is not well taken, and that the bill is sufficient in form and in detail and adequately presents a case within G. L. (Ter. Ed.) c. 93, §§ 2, 3. See *Commonwealth* v. *Dyer,* 243 Mass. 472. In so far as the demurrer raises issues of substantive law we shall consider them in connection with the same or similar issues raised upon the pleas and the answer and at the hearing on the merits. Nothing would be gained by discussing the pleadings separately.

5. The case was heard at great length, and the evidence is reported. The judge made detailed findings of fact, which are supported by the evidence and which we shall now summarize in so far as seems necessary for the purposes of this decision. We include one or two findings of minor importance which we ourselves make from evidence so clear that we think them indisputable.

The Atlantic Fishermen's Union is an association of men engaged in commercial deep sea fishing from certain North Atlantic ports of the United States. Its stated objects are to improve working conditions and to "receive a fair share of the profits of our labor commensurate with the dangers and hardships of our occupation." Its members assume an obligation "to obey all orders, rules and regulations, and decisions" of the union. The union has no locals but maintains headquarters in Boston and so called branches in Gloucester, New Bedford, and New York, all under the immediate jurisdiction of headquarters. It maintains in New Bedford, New York, and Gloucester "port agents" one of whose duties is to "see as far as possible that no vessel shall leave port unless it has a full union crew and pays regular union wages and lays." The union's "territory" extends from Eastport, Maine, to Norfolk, Virginia, but a great majority of the members and all the officers are residents of Massachusetts. About thirty-five hundred members live in Massachusetts, of whom about seventeen

hundred sail out of Gloucester, about one thousand out of Boston, and about eight hundred out of New Bedford or Nantucket. The Massachusetts fishing fleet comprises over five hundred vessels ranging in size from large trawlers carrying crews of about seventeen men to small boats carrying crews of from four to six men. In the year 1946 (the last full year before the hearing on the merits in this cause), according to statistics of the United States Department of the Interior, there were landed at the three principal ports of Gloucester, Boston, and New Bedford four hundred sixty-six million four hundred forty-three thousand seven hundred two [1] pounds of fish, valued at $36,116,057. "Relatively few Massachusetts fishermen engaged in the same business as the defendants [2] are not members of the union. Relatively few Massachusetts fishing boats are not manned by union crews. The union has a virtual control of the man power engaged on Massachusetts boats in catching and marketing fresh sea fish in this Commonwealth."

The captains of the vessels, except a few who own their vessels, are employed by the vessel owners. The captains in turn hire the crews. The fishermen, generally speaking at least, do not receive a daily or hourly wage. They are paid by a share of the proceeds of their catches, called the lay. The lay is calculated after the deduction of certain expenses and charges. It is governed in detail by collective bargaining contracts between the union and the vessel owners. Under the contracts in force at the time of the hearing, the lay of the fishermen was sixty per cent of the net proceeds, the vessel owners receiving forty per cent.

Since catches of fresh fish deteriorate rapidly, it is necessary that they be sold promptly upon arrival of the vessels. Sales are no longer effected by independent trading at the various wharves at which the vessels are berthed. At Gloucester and New Bedford the union maintains and

---

[1] Includes scallops landed at New Bedford.

[2] The business or industry of fishing for lobsters and other shell fish seems to be regarded as separate from the business or industry in which the defendants are engaged. It does not appear that the shell fishermen belong to the union, and in general this case is not concerned with the shell fishery.

operates so called selling rooms at which the catches of the
vessels are sold very much in the manner of public auctions
by employees of the union soon after the vessels arrive. The
captain of a vessel may reject a final bid, and in that case
the catch is again put up for sale later in the day. Vessel
owners and fish dealers have nothing to do with the oper-
ation of these selling rooms. The union "requires" that
fish taken by union manned boats be sold in the union's
selling rooms. "The very great bulk of fish landed . . . [at
Gloucester and New Bedford] is brought in by union
manned boats and sold in those rooms. Buyers in those
cities can buy very little fish except in the rooms." No fees
are required of dealers in the union's selling rooms, and
"theoretically any dealer who buys in quantity may buy in
the selling rooms, but actually he might not unless he is in
good standing with the union, as will hereafter appear."
In Boston the fish are sold in much the same way at the
New England Fish Exchange on the "Boston Fish Pier."
Selling on the exchange is conducted by agents appointed
by the boat owners under a set of rules approved by the
United States District Court in accordance with a decree
entered December 4, 1919, in a suit by the United States
against the exchange and others for violation of the Sherman
act. See *United States* v. *New England Fish Exchange,* 258
Fed. 732. These rules contain full and explicit provisions
defining the privileges, rights, and duties of persons per-
mitted to sell and buy on the exchange and require fair,
free, and open bidding and genuine, honest sales. Some of
the dealers who buy at the three ports are themselves own-
ers of fishing vessels, but they bid in competition with others
on the catches of their own vessels. So far as appears this
arrangement is satisfactory, and there is no controversy in
reference to it.

Massachusetts is herself a very large consumer of fresh
and other fish. Nevertheless, large quantities of the fresh
fish brought into the three ports on union manned boats are
there sold to buyers who transport them to other States or

who freeze or otherwise process the fish, convert them into fillets and other products, and then sell them to customers in other States. Such buyers in thus disposing of fish are engaged in interstate commerce. The defendants' connection with the fish ends with the sale and delivery in this Commonwealth to buyers who receive and pay for it here. "It is a matter of indifference to the defendants what buyers do with their fish."

"The controversy between the parties to this suit arises mainly from a series of votes or rules adopted by the union in its three Massachusetts branches beginning in 1944 and continuing to as late as May, 1947 [after this suit was brought], and was precipitated by an episode that occurred in January, 1947, in the Gloucester selling room involving Gorton-Pew Fisheries, Ltd. . . . and by an episode involving many Boston trawlers that occurred on the Fish Pier in February, 1947." These votes or rules, of which the Commonwealth complains, are about sixty in number. About thirteen of them were passed after the preliminary injunction in this case was issued on February 21, 1947. All had the approval of the union headquarters and of the membership. These votes fall into three categories, (1) those limiting the number of pounds of fish of the several varieties that could be caught by one man or brought in by one vessel on a single trip, (2) those fixing minimum prices for certain kinds of fish below which the union would not permit such fish to be sold, and (3) those imposing penalties such as fines or being held in port upon men or vessels violating the votes in the first two categories. During the war many fishing vessels were taken over by the government, and many fishermen entered the armed forces. The reduced supply of fish, concurring with a shortage of meat, created a very great demand and in general enabled fishermen to obtain the highest ceiling prices allowed by "O. P. A." rules. The fishermen were prosperous and continued so to be during the year 1946, in May of which year the ceiling prices expired. One vote passed in Boston in November, 1944, read, "That the reason for the cut in production of

codfish is the cut in prices. Because of the cut in prices we will cut production further necessary to hold ceiling prices of all types of fish." Notwithstanding assertions by the defendants at the hearing of other purposes in passing the votes above described, the judge found that "the dominant and controlling purpose of the defendants was to force buyers to pay prices for certain kinds of fish (the kinds that constitute the great bulk of fish caught by union boats) not less than the highest prices that such fish could be sold for under former O. P. A. rules. The probable consequence of the accomplishment of that purpose will be to make fish cost more to the Massachusetts buyer and the Massachusetts ultimate consumer than it would if supplies were not thus artificially limited and prices were not thus sought artificially to be controlled, but were left to be governed by the law of supply and demand unrestricted in its operation by such limitations." The judge said that it was impossible to find upon the evidence that the enforcement of the defendants' votes has "unduly enhanced" the price of fish within the Commonwealth, but he did find that, to quote again from the statute, the price *"may* be unduly enhanced" thereby (italics ours).

For the sake of completeness it becomes necessary to mention briefly the two so called episodes, one at Gloucester and one at Boston, which in our view have now become of only secondary importance, but which were the occasion of certain allegations in the bill and which do throw some light upon the manner in which the defendants operated in combination, the power they exercised, and the effect of their acts. For many years the union has insisted that not over five per cent be deducted for ice and "trash"[1] from the weight of any catch of so called redfish, but there had been no formal vote to that effect. The dealers have acquiesced, but have tried to negotiate with the union for a deduction that would be fair in all cases. In fact the weight of the ice adhering to the fish and the "trash" sometimes runs to

---

[1] "Trash" is anything brought up by the nets except edible fish of marketable size.

twenty per cent or more of the total weight. In November, 1946, Gorton-Pew Fisheries, Ltd., the largest purchasers of fish in Gloucester, bought in the selling room three catches which, when weighed, were found to contain about fifteen per cent of ice and "trash." Gorton-Pew withheld a corresponding part of the price. The amount in dispute was about $1,100. Thereafter the union passed votes imposing the five per cent rule. After that, beginning January 16, 1947, the union's auctioneer in the selling room declined to recognize any bids in behalf of Gorton-Pew. Two captains who wished to sell to Gorton-Pew were told in substance by representatives of the union that if they did so they would be blacklisted and would not be permitted to hire union crews. Beginning about February 1, Gorton-Pew's bids were again recognized, but the three vessels whose catches were involved, two of which were owned by Gorton-Pew, remained idle for lack of union crews until about the middle of May, 1947, when Gorton-Pew yielded to the union and paid the three crews their shares of the disputed sum. The Boston incident was this. On February 17, 1947, nineteen trawlers arrived at the Fish Pier, and their catches were regularly sold. Notwithstanding that Lent was to begin two days later, the large supply caused a sharp drop in prices below the minimum prices voted by the union on February 7, which were the former maximum "O. P. A." prices. The union crews refused to discharge their catches. By February 24 the number of trawlers at the pier had risen to thirty, and the catches of all of them had been sold, but prices were still below the union's minimum, and the crews, on orders from the union's officers, would not discharge their catches, which then amounted to over two million pounds, until after the preliminary injunction in this cause. But by that time about three hundred thousand pounds were condemned as unfit for food and were sold for fertilizer.

The trial judge made a further comprehensive general finding, not stated as a mere conclusion from other findings, in these words, "What the defendants have done is to use

their control of virtually all the man power engaged in the marketing of fresh fish in this Commonwealth (a control which in itself is lawful and harmless) and thereby, by arbitrary and unilateral action to establish minimum prices in the Commonwealth for an essential article of food; to create and maintain a monopoly whereby competition in the Commonwealth in the price of such commodity may be restrained or prevented; and to enter into an agreement or combination whereby the price of such commodity may be unduly enhanced within the Commonwealth." He ruled that a combination or agreement having such purposes and effects is in violation of the common law, contrary to public policy and illegal under G. L. (Ter. Ed.) c. 93, § 2; that the defendants were not exonerated because they were members of a labor union from obedience to that statute and were not immunized against suit by the Commonwealth for its violation by any acts of Congress; that this was not a labor dispute; and that the subject matter was within the jurisdiction of the court. He entered a final decree in favor of the Commonwealth. The defendants appeal.

6. The judge correctly ruled that the conduct of the defendants was in violation of the common law and of G. L. (Ter. Ed.) c. 93, § 2. It has been said that the statute is in itself simply declaratory of the common law. *Milliken-Tomlinson Co.* v. *American Sugar Refining Co.* 9 Fed. (2d) 809, 815. Monopoly in "the modern and wider sense" has been defined as "a combination, organization or entity so extensive and unified that its tendency is to suppress competition, to acquire a dominance in the market and to secure the power to control prices to the public harm with respect to any commodity which people are under a practical compulsion to buy." *Commonwealth* v. *Dyer*, 243 Mass. 472, 486. The combination of the defendants, embracing as it did practically all of the commercial fishermen operating over a wide area and bringing their catches into ports of this Commonwealth, fortified and directed toward control of the market by means of the votes, practices, and penal-

ties hereinbefore described, was sufficiently extensive, unified, and powerful and exhibited the purpose and tendency required to bring it within the foregoing definition and to constitute a monopoly in violation of the common law. This is true even though some competition in the fish industry had developed and more might develop from foreign countries or other sources, and even if we accept as correct all evidence offered as to this possibility.

The statute, G. L. (Ter. Ed.) c. 93, § 2, hereinbefore set forth in full, in its application to this case, placed under the ban every agreement, arrangement, combination or practice in violation of the common law (1) whereby a monopoly in the production or sale of any commodity in common use "is or may be created, established or maintained," or (2) whereby competition in the supply or price of any such commodity "is or may be restrained or prevented," or (3) whereby for the purpose of creating, establishing, or maintaining a monopoly of the production or sale of any such commodity the free pursuit of any lawful business, trade or occupation "is or may be restrained or prevented," or (4)[1] whereby the price of any such commodity "is or may be unduly enhanced." It is unnecessary to review the facts found as hereinbefore stated at length. Upon those facts it cannot be doubted that the defendants' course of conduct has violated all four of these prohibitions.

In so far as unreasonableness of restraint upon production, trade, or price may be a necessary element in an illegal monopoly, we think it plain that the direct and intentional limitation of total production and the arbitrary fixing of prices covering practically all large scale transactions in an entire market area by a combination sufficiently extensive and powerful to enforce its decrees are in themselves of the very essence of that which the common law and the statute aim to prevent, and that no inquiry is necessary to determine whether prices have actually reached a level which by some standard can be pronounced unreasonable. *United*

---

[1] Added to the original statute as a result of St. 1911, c. 503, § 1.

*States* v. *Trenton Potteries Co.* 273 U. S. 392, 395–401. *United States* v. *Socony-Vacuum Oil Co. Inc.* 310 U. S. 150, 212–224. *American Tobacco Co.* v. *United States,* 328 U. S. 781, 811. *Commonwealth* v. *Dyer,* 243 Mass. 472, 486–487. This case is to be distinguished from cases like *Central Shade Roller Co.* v. *Cushman,* 143 Mass. 353, *Commonwealth* v. *North Shore Ice Delivery Co.* 220 Mass. 55, *Berenson* v. *H. G. Vogel Co.* 253 Mass. 185, and *Robitaille* v. *Morse,* 283 Mass. 27, 32–33, where the restraint did not reach dimensions involving the public interest. See *Keith* v. *Heywood Boot & Shoe Co.* 255 Mass. 321. The statute would mean little or nothing if it did not apply in a case like this.

We cannot agree with the defendants' argument that they have done nothing more than engage in ordinary labor union activities for the purpose of improving their economic condition. Doubtless their ultimate purpose was to improve their economic condition, but that is the purpose of all persons who engage in monopolistic enterprises. The defendants' method of first bringing into their combination practically all the fishermen and then using the control over the supply of one of the necessaries of life which this gave them directly and intentionally to reduce the supply and to raise the price is hardly the conventional pattern of labor union activity. There remain open to the defendants many other ways of improving their condition by insisting upon a more favorable lay and other terms of employment. At any rate the Legislature has declared such conduct as that of the defendants to be contrary to the public interest and has thereby established the public policy of the Commonwealth. The court is as fully bound to enforce that policy now in the case of a combination of fishermen as it was in the case of a combination of fish dealers in somewhat similar circumstances after the first World War (*Commonwealth* v. *Dyer,* 243 Mass. 472), or as it would be now if the owners of substantially all the vessels should combine to do what the defendants have done. There is no foundation for any contention that the State statute does not apply to labor organizations. See *A. T. Stearns Lumber Co.* v.

*Howlett,* 260 Mass. 45, 56–58. There is nothing in its wording or history to suggest that it does not apply, as do other statutes, to any group of persons whose conduct brings them within the statutory terms.

7. We are not prepared to accept the defendants' contention that their activities, being in the field of interstate commerce, are wholly within Federal jurisdiction; that the Sherman act, U. S. C. (1946 ed.) Title 15, §§ 1, 2, and the Clayton act, U. S. C. (1946 ed.) Title 15, § 17 (withdrawing labor organizations to some extent from the operation of the first two sections), occupy the entire field to the total exclusion of State law.[1]

We assume without discussion that the operations of the defendants as fishermen occur to a considerable degree in the stream of interstate or foreign commerce both because of the sale and transportation of a substantial portion of the product to other States after it is landed, and because the product comes from the high seas (*The Abby Dodge,* 223 U. S. 166), and we further assume that the restraints imposed by the defendants affected that commerce in addition to their effect upon intrastate commerce.[2] But we are

---

[1] The Sherman act, U. S. C. (1946 ed.) Title 15, § 1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: . . . [Provisos which follow are not material in this case]."

§ 2. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

The Clayton act, U. S. C. (1946 ed.) Title 15, § 17, "The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

[2] We mention only a few of the more recent cases. *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148, 153, 154. *Wickard* v. *Filburn,* 317 U. S. 111, 120–125. *United States* v. *Frankfort Distilleries, Inc.* 324 U. S. 293, 297–298. *United States* v. *Yellow Cab Co.* 332 U. S. 218. *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.* 334 U. S. 219. *United States* v. *Women's Sportswear Manufacturers Association,* 336 U. S. 460, 464. For a case particu-

not yet convinced that the State anti-monopoly law has been entirely superseded except in that narrow class of cases in which a monopolistic practice has little or no effect upon interstate commerce. To the best of our knowledge most of the States have constitutional provisions or statutes on this subject, many of them adopted subsequently to the Sherman act.[1] These enactments are outgrowths of long established common law doctrines and were designed to extend and adapt those doctrines to the needs of the time and locality as seen by the local law making bodies. These needs still exist, notwithstanding the Sherman act. Monopolies and restraints of trade are of infinite form and variety. They range in extent and importance from that which is inconsequential to that which is of the utmost consequence. Some expend their effects almost wholly upon intrastate commerce and are of only local interest and some almost wholly upon interstate commerce and so become matters of national concern, and there are all gradations between. In many cases it would be very difficult to draw the line. If State laws have no force as soon as interstate commerce begins to be affected, a very large area will be fenced off in which the States will be practically helpless to protect their citizens without, so far as we can perceive, any corresponding contribution to the national welfare. See *Duckworth* v. *Arkansas*, 314 U. S. 390, 394. Especially is this true in view of the immense broadening in the conception of interstate commerce in recent years. In general, the purposes of the State and the Federal laws are the same. Certainly that is true of our statute and the Sherman act. If there should be conflict between the State law and the Federal law the Federal law would of course prevail whenever interstate commerce was involved. A State court should be thoroughly convinced before it abandons jurisdiction over subjects that historically have been within the

larly relating to the fish industry see *Local 36 of International Fishermen & Allied Workers of America* v. *United States*, 177 Fed. (2d) 320, particularly at pages 327–328.

[1] See "A Collection and Survey of State Anti-Trust Laws," 32 Col. L. Rev. 347; "The Illinois Anti-Trust Law Disinterred," 43 Ill. L. Rev. 205.

competence of the State, lest it discover later that it has retreated where the Federal government will not advance and has therefore been derelict in its duty. We should be assuming a heavy responsibility if we were to take the position that the great existing mass of State legislation to which we have referred is, and ever since 1890 has been, so limited in practical usefulness. The Supreme Court of the United States has often in various forms reiterated the caution expressed in *Illinois Central Railroad* v. *State Public Utilities Commission of Illinois*, 245 U. S. 493, 510, in these words, "In construing federal statutes enacted under the power conferred by the commerce clause of the Constitution the rule is that it should never be held that Congress intends to supersede or suspend the exercise of the reserved powers of a State, even where that may be done, unless, and except so far as, its purpose to do so is clearly manifested." See cases collected in dissenting opinion of Mr. Justice Frankfurter in *Hill* v. *Florida*, 325 U. S. 538, 549–552. State courts especially should heed the warning. We do not think that such purpose is "clearly manifested" in this instance. We have seen no case holding that Federal legislation has, in general, displaced State anti-trust laws. In *Puerto Rico* v. *Shell Co.* (*P. R.*), *Ltd.* 302 U. S. 253, it was held that a statute of Puerto Rico closely following the form of the Sherman act should be enforced in the local courts, largely on the ground that the Legislature of Puerto Rico had powers almost as broad as those of the Legislature of a State. See *Standard Oil Co. of Kentucky* v. *Tennessee*, 217 U. S. 413, 421–422; *Commonwealth* v. *Strauss*, 191 Mass. 545, 555, writ of error dismissed sub nomine *Strauss* v. *Commonwealth*, 207 U. S. 599; *Opinion of the Justices*, 211 Mass. 620, 623; *Ritholz* v. *Ammon*, 240 Wis. 578. Nothing would be accomplished by a discussion on our part of more or less analogous Federal cases. Our views are not final in any event. It is enough for the present that there are cases which give us reason to think that the Federal and State laws may operate together, even if in some aspects a monopoly which violates State law also tends to restrain

interstate commerce.[1]  The statement found in *Atlantic Cleaners & Dyers, Inc.* v. *United States,* 286 U. S. 427, 435, and repeated in later cases, "A consideration of the history of the period immediately preceding and accompanying the passage of the Sherman Act and of the mischief to be remedied, as well as the general trend of debate in both houses, sanctions the conclusion that Congress meant to deal comprehensively and effectively with the evils resulting from contracts, combinations and conspiracies in restraint of trade, and to that end to exercise all the power it possessed," appears to us from the context to have referred to the inclusive nature of the "restraint" intended to be reached and does not seem to have had reference to the exclusion of State laws.  See *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 495.

If we are right in holding that the Federal statutes do not occupy the entire field to the exclusion of State law, we do not believe that any difference in the applicability to labor organizations of the Sherman act as qualified by the Clayton act and of the State law presents a conflict between the two systems, so that the State law cannot operate in this case.  To begin with, it is settled that the Clayton act does not exempt labor organizations from the Sherman act in all cases.  This is not a case of a local strike against a factory or upon a particular job, where the consequences to commerce are incidental and not the prime object or

[1] *Waters-Pierce Oil Co.* v. *Texas (No. 1),* 212 U. S. 86, 107.  *Straus* v. *American Publishers' Association,* 231 U. S. 222.  *Kelly* v. *Washington,* 302 U. S. 1, 9–14.  *H. P. Welch Co.* v. *New Hampshire,* 306 U. S. 79, 84–85.  *Watson* v. *Buck,* 313 U. S. 387, 403–404.  *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148, 154–159.  *Allen-Bradley Local No. 1111, United Electrical, Radio & Machine Workers of America* v. *Wisconsin Employment Relations Board,* 315 U. S. 740.  *Parker* v. *Brown,* 317 U. S. 341, 350–352.  *United States* v. *South-Eastern Underwriters Association,* 322 U. S. 533, 561–562.  See also dissenting opinion of Stone, C.J., pages 581–583.  *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 766.  *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, 418–421.  *Bethlehem Steel Co.* v. *New York State Labor Relations Board,* 330 U. S. 767.  *Rice* v. *Santa Fe Elevator Corp.* 331 U. S. 218, 230–231.  *International Union, U. A. W. A., A. F. of L., Local 232* v. *Wisconsin Employment Relations Board,* 336 U. S. 245, 252–258.  *Giboney* v. *Empire Storage & Ice Co.* 336 U. S. 490, 495.  *California* v. *Zook,* 336 U. S. 725.  Two helpful decisions in State courts are *Speegle* v. *Board of Fire Underwriters of the Pacific,* 29 Cal. (2d) 34, 48–51, and *Mayer Bros. Poultry Farms* v. *Meltzer,* 274 App. Div. (N. Y.) 169, 176–177.  And see *Mathews Conveyer Co.* v. *Palmer-Bee Co.* 135 Fed. (2d) 73, 82.

effect of the combination. This is a case where the defendants, practically controlling the production and having the necessary power, have intentionally set out upon the project of reducing the production and increasing the price of a necessary of life in a wide market. It would seem that under the doctrine of *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, and *United States* v. *Hutcheson,* 312 U. S. 219, such a combination would not be protected by the Clayton act against the impact of the Sherman act. But if we are wrong in this, we still do not think that there is conflict between the two systems of law as applied to this or any particular case. This is simply an instance where the State law is somewhat more inclusive than the Federal law as now amended. It would seem that in the absence of complete preëmption of the field such differences are permissible, and that State law may cover a form of monopoly which the Federal law no longer reaches. *Mayer Bros. Poultry Farms* v. *Meltzer,* 274 App. Div. (N. Y.) 169, 175–176.

8. It is proper to say at this point that this case does not involve or arise out of a "labor dispute" within any definition of "labor dispute" with which we are familiar. G. L. (Ter. Ed.) c. 149, § 20C, inserted by St. 1935, c. 407, § 1 (see now St. 1950, c. 452, § 2). G. L. (Ter. Ed.) c. 150A, § 2 (7), inserted by St. 1938, c. 345, § 2. U. S. C. (1946 ed.) Title 29, §§ 113, 152 (9). Labor management relations act of 1947, 61 U. S. Sts. at Large, 138. There is no controversy concerning terms or conditions of employment or the association or representation of persons in respect to conditions of employment. *Columbia River Packers Association, Inc.* v. *Hinton,* 315 U. S. 143. *Bakery Sales Drivers Local Union No. 33* v. *Wagshal,* 333 U. S. 437. This is simply a case where the State is trying to enforce its laws and to enjoin the defendants in accordance with the provisions of G. L. (Ter. Ed.) c. 93, § 3. *United States* v. *United Mine Workers of America,* 330 U. S. 258, 269–289. There is nothing in the so called episodes at Gloucester or Boston, where controversies arose, not over employment, but over sales of fish to buyers, that alters the situation or affects the right

of the State to proceed under § 3 without complying with the requirements of the so called anti-injunction law, G. L. (Ter. Ed.) c. 214, § 9A, inserted by St. 1935, c. 407, § 4. *Columbia River Packers Association, Inc.* v. *Hinton,* 315 U. S. 143, 147.

9. In our opinion the defendants are not immunized against the State anti-monopoly law by any provision of the fisheries coöperative marketing act, U. S. C. (1946 ed.) Title 15, §§ 521, 522. Section 521 provides in part that "Persons engaged in the fishery industry, as fishermen . . . may act together in associations, corporate or otherwise, with or without capital stock, in collectively catching, producing, preparing for market, processing, handling, and marketing in interstate and foreign commerce, such products of said persons so engaged." An additional provision is that the association shall not deal in the products of non-members to an amount greater in value than such as are handled by it for members. Section 522 authorizes the Secretary of the Interior to issue orders requiring such associations to cease and desist from monopolization or restraint of trade in interstate or foreign commerce, such orders to be enforced if necessary by proceedings in a United States District Court.

The wording of these sections seems to us to indicate that they refer to associations of independent entrepreneurs each of whom, or at least most of whom, are engaged in fishing on their own separate accounts (see *Columbia River Packers Association, Inc.* v. *Hinton,* 315 U. S. 143, 144–145) and not to a labor union of fishermen employed by others. *Hawaiian Tuna Packers, Ltd.* v. *International Longshoremen's & Warehousemen's Union (C. I. O.)* 72 Fed. Sup. 562, 566. This construction is consistent with the wording of the Capper-Volstead act, U. S. C. (1946 ed.) Title 7, §§ 291–292 (and see § 2 for definitions), which relates to farm coöperatives, and from which the fisheries coöperative marketing act appears to have been derived. It is difficult for us to imagine an association of hired farm help, having nothing of their own to sell, qualifying as a farmers' coöperative.

The defendants are employees of the vessel owners and not entrepreneurs on their own accounts. They so insist in their brief. According to former decisions of this court they do not own the fish which they catch (*Bishop* v. *Shepherd*, 23 Pick. 492, 494–495; see *Adams* v. *Augustine*, 195 Mass. 289), although, so long as they work under the lay system of compensation, they have an interest in the price which the fish brings. Moreover, we do not think that the defendants are acting "collectively" in the sense of the act. It is true that in two places they operate selling rooms, but the catch of each vessel is sold separately, and the crew of one vessel has no interest in the catch of another vessel.

But if we are mistaken in our interpretation of the scope of the fisheries coöperative marketing act, still it is established that that act, notwithstanding its provisions for an administrative remedy for monopoly, does not exclude proceedings in court under the Sherman act. *United States* v. *Borden Co.* 308 U. S. 188, 203–206. *Hinton* v. *Columbia River Packers Association, Inc.* 131 Fed. (2d) 88. By a parity of reasoning it would seem that it does not exclude proceedings in court under a State anti-monopoly statute which has not been superseded by other Federal legislation.

10. We cannot follow the defendants' argument that this whole matter is exclusively one of admiralty cognizance and that for that reason State courts have no jurisdiction. The combination of the defendants was formed upon land. The votes that gave it substance were passed upon land. The meetings of the union are held upon land. Its officers perform their functions and keep the combination alive upon land. The effects of the combination are felt upon land where the fish are sold. No maritime contracts are in issue. No case has been shown to us in which a court of admiralty has attempted to deal with a situation comparable to this. In our view this is simply not a maritime matter, and is not made such by the fact that the fish are caught in the sea. Some years ago when the United States took action against the fish dealers in consequence of an unlawful monopoly, it proceeded under the Sherman act. There was no sug-

gestion that the matter pertained in any way to the admiralty. *United States* v. *New England Fish Exchange,* 258 Fed. 732. *United States* v. *New England Fish Exchange,* 292 Fed. 511. We do not see how a court of admiralty could lay hold of a subject like this.

11. Neither are we impressed by the argument that State courts have no jurisdiction because the Boston Fish Pier, where such fish as come to Boston are landed, is located in the sea beyond mean low water mark as it existed at the formation of the United States. This argument, of course, has no bearing upon the conduct of the defendants at Gloucester or New Bedford. It seems to rest principally upon the decision in *United States* v. *California,* 332 U. S. 19. See also *United States* v. *Louisiana,* 339 U. S. 699; *United States* v. *Texas,* 339 U. S. 707. But we do not understand that these decisions apply to submerged lands in navigable rivers and harbors. See 332 U. S. at pages 30–31, 36, 37. We suppose that most piers at which vessels can be berthed are built upon the bottom of the sea below mean low water. Yet so far as we are aware, the States have always exercised without question jurisdiction over such piers for the ordinary enforcement of their laws. Many cases in the books testify to this fact. See *Commonwealth* v. *Boston Terminal Co.* 185 Mass. 281. Moreover, before the decision in *United States* v. *California* various decisions of the Supreme Court had even recognized a large measure of control in the States over territorial and adjacent waters and fishing therein. Among such cases was *Manchester* v. *Massachusetts,* 139 U. S. 240, affirming *Commonwealth* v. *Manchester,* 152 Mass. 230, and upholding a statute of the Commonwealth regulating menhaden fishing in Buzzard's Bay. In *Commonwealth* v. *Manchester,* 152 Mass., at page 242, this court said, "It must, we think, be considered as settled, that, if land on the coast be reclaimed from the sea, or if piers or wharves be extended into the sea, such land and structures are a part of the territory of the State whose shores they adjoin," citing cases. Another and more recent case in the Supreme Court was *Skiriotes* v. *Florida,* 313 U. S. 69, where the

court, speaking through Chief Justice Hughes, said, at page 77, "If the United States may control the conduct of its citizens upon the high seas, we see no reason why the State of Florida may not likewise govern the conduct of its citizens upon the high seas with respect to matters in which the State has a legitimate interest and where there is no conflict with acts of Congress." We do not understand that the *Manchester* and *Skiriotes* cases were overruled in *United States* v. *California.* On the contrary, they were distinguished. 332 U. S. at pages 37–38. The cases just cited, as well as broader grounds of sound reasoning, are sufficient to refute the idea that the courts of the State are limited in dealing with this case in any of its aspects because the Boston Fish Pier stands on the harbor bottom below the ebb of the tide.

12. The defendants took exceptions to rulings upon questions of evidence relating to the hearing on the merits. In so far as these can properly be said to have been argued, we discover no error in the admissions or exclusions. Much of the evidence in the form of exhibits offered and excluded, in so far as it has been transmitted to us, so that we can see what it was, consisted of reports of government agencies and tabulations and statistics of various kinds. These were hearsay and were not made competent by any rule of law. Perhaps some of them might now be admitted in the discretion of the judge under G. L. (Ter. Ed.) c. 233, § 79B, inserted by St. 1947, c. 385, § 1, but that statute had not taken effect at the time of the hearing. A letter from the Gloucester Cold Storage Warehouse was likewise hearsay. Documents tending to show that certain persons and corporations, said to have been fish dealers in New Bedford, had been indicted and fined for violation of the Sherman act and a letter from the Attorney General of the United States to the Attorney General of the Commonwealth had no bearing upon any issue in the case. The records of votes of the union, which were admitted, were plainly competent.

All these exceptions must be overruled.

13. The defendants have also presented a bill of exceptions based upon the refusal of their request for amplified

findings of facts in respect to twenty-five specified matters. Some of these were immaterial. Some were already adequately covered by findings made. Some might perhaps have been granted. It is a serious question whether a situation is presented in which a bill of exceptions will lie. See *Sullivan* v. *Sullivan*, 320 Mass. 114, 115–116, and cases cited; *Vergnani* v. *Vergnani*, 321 Mass. 699, 701–702. However this may be, we have before us all the evidence in voluminous array, and we have ourselves considered all of it. As to most of the matters about which further findings were requested there was little or no dispute. It is plain that no harm was done by the refusal of further findings. These exceptions must be overruled.

14. The defendants complain of indefiniteness in the final decree, particularly in that, as they assert, it makes "fair market value" a test of the legality of their conduct. As the decree reads, the defendants are enjoined from "combining to prevent the sale of fresh fish at its fair market value when offered for sale; in discriminating between buyers of fresh fish who are willing to pay the fair market value of said fish; in preventing a free and fair market in the sale of fresh fish; in fixing the price of fresh fish above a fair market value, or in setting a price above such fair market value below which fresh fish will not be offered for sale or the sale voided by any concerted and combined action of the respondents as above described." We think this part of the decree should be modified by substituting therefor the following, "combining to prevent or interfere with a free and fair market in the sale of fresh fish by (1) discriminating against buyers able and willing to pay the highest prices or (2) fixing a price or prices below which fresh fish will not be sold; but nothing contained herein shall be construed to prevent individual captains and separate crews, acting independently of other captains and crews, from selling particular catches at the highest prices obtainable therefor."

The fifth paragraph of the final decree orders the de-

fendants "to cease and desist from conspiring to limit the production by them of fresh fish for the purpose or having the effect of preventing the sale of fresh fish at its fair market value when offered for sale or preventing a free and fair market in the selling of fresh fish within the Commonwealth of Massachusetts." We think the following should be substituted, "to cease and desist from combining to restrict the production of fresh fish for the purpose or having the effect of limiting the supply or increasing the price; but nothing herein contained shall be construed to prevent the defendants from in good faith bargaining collectively or striking for the primary purpose of securing higher wages, a larger share of the lay, or better working conditions, even though an incidental effect may be to reduce the supply or increase the price; and nothing herein contained shall be construed to prevent compliance with the requirements of any law, treaty, or convention limiting the catching of fish."

It must be recognized that there are great difficulties in drafting a satisfactory decree in a case of this kind. All decrees must be construed with reference to the nature of the case and the wrongs sought to be remedied. *Attorney General* v. *New York, New Haven & Hartford Railroad,* 201 Mass. 370, 372. *Boruchoff* v. *Ayvasian,* 323 Mass. 1, 9. That principle has special application to a case like this. It must always be remembered that the object of this decree is to bring to an end monopolistic practices proved to exist in violation of G. L. (Ter. Ed.) c. 93, § 2. The decree must be construed to accomplish that object fully and effectively, but it must not be construed as extending beyond the design of the statute or the scope of the litigation. It is not intended that the fishermen be placed in a position inferior to that of other working men in respect to their general right to improve their condition.

15. We come finally to a consideration of the contempt proceeding, in which the judge found that the defendants had violated the preliminary injunction issued in this cause,

and ordered the union to pay $500 to the use of the Commonwealth.

We do not find it necessary to decide whether questions arising out of the contempt proceeding were rightly brought here either by bill of exceptions or by appeal, both of which methods the defendants have attempted to employ. There have been intimations that neither of these procedures is correct. See the cases collected in *New England Novelty Co. Inc.* v. *Sandberg,* 315 Mass. 739, 746–748. It is now settled, however, that where the contempt consists of disobedience to a final decree in equity and has been dealt with civilly and in no respect criminally, an appeal is proper. *Godard* v. *Babson-Dow Manuf. Co.* 319 Mass. 345, 348. *Cameron* v. *Durkin,* 321 Mass. 590, 596. At some time we may be required to examine further into questions of procedure, but it is unnecessary to do so in this case, since in any event the ultimate decision must be against the defendants. In such case it is proper to confine ourselves to "stating the grounds of substantive law which support the result." *Commonwealth* v. *McNary,* 246 Mass. 46, 48.

The preliminary injunction was within the jurisdiction of the court. While it was in effect the defendants were bound to obey it according to its terms. *Irving & Casson-A. H. Davenport Co.* v. *Howlett,* 229 Mass. 560. *New England Novelty Co. Inc.* v. *Sandberg,* 315 Mass. 739, 753. *United States* v. *United Mine Workers of America,* 330 U. S. 258, 293–294. This remains true even if the decree, with its use of the words "fair market value," was not as definite as could have been desired. Nothing in the contempt proceeding turned upon whether any particular price or value was fair or unfair.

The judge found the defendants guilty of violating the injunction by passing an additional vote limiting the production of fish after they had knowledge of the injunction. Findings were ample that this was an official act of the union. The injunction forbade the defendants from combining to prevent the sale of fresh fish at its fair market value when offered for sale, in discriminating between

buyers willing to pay a fair market value, in preventing a free and fair market in the selling of fresh fish, or in fixing the price above a fair market value. The judge found that the members of the union knew that the real purpose of all votes to limit catches of fish was to hold the price line at the maximum level of prices for fresh fish permissible under the former "O. P. A." rules. These votes were therefore one means adopted of fixing prices and so of preventing a free and fair market. The judge found that the defendants who participated in the vote knew or ought to have known that the vote was within the prohibition of the injunction. He found that "By that vote with intent to enforce it they flouted the dignity and authority of the court."

We cannot agree with the defendants that the trial judge should have admitted in evidence remarks of the judge who issued the preliminary injunction. What that judge said before the terms of the injunction were finally settled and before the injunction was issued could not be used to interpret or qualify the language of the decree itself. Neither do we think there was error in refusing to admit these remarks as bearing upon the question whether the conduct of the defendants was contumacious. We do not find in the remarks of the judge anything which would tend to excuse the defendants from the consequences of a violation of the injunction when construed according to the true meaning of the words of the decree. See *Boyer* v. *Bowles*, 316 Mass. 90, 94.

According to our practice the judge was under no duty, at the request of the defendants made in the very final stage of the hearing, to require the Attorney General to elect whether the contempt alleged was civil or criminal, and the judge was under no duty himself at that moment to pass upon that question in the abstract. Ultimately the judge ruled that the contempt was a civil one. See *Root* v. *Mac-Donald*, 260 Mass. 344; *New England Novelty Co. Inc.* v. *Sandberg*, 315 Mass. 739, 749. We do not understand that the correctness of this ruling is now challenged, and we do not pass upon it. Neither does the correctness of the ruling

appear to be material to any question that is argued. It was open to the defendants at any time during the hearing, if and when the character of the contempt as civil or criminal became of any importance, to take such position as they saw fit as to its nature, to ask that the hearing be conducted accordingly, and to register their objections if the judge did not agree with them. See *Root* v. *MacDonald*, 260 Mass. 344, 364–367; *United States* v. *United Mine Workers of America*, 330 U. S. 258, 295–301.

Whether the contempt was civil or criminal, the defendants were not entitled to a jury trial. *Root* v. *MacDonald*, 260 Mass. 344, 365. They were not entitled to a jury trial under G. L. (Ter. Ed.) c. 220, § 13A, inserted by St. 1935, c. 407, § 5, because, for one reason, the matter did not involve or grow out of a "labor dispute."

16. The interlocutory decrees denying the petitions for removal and the motion to dismiss and quash, and overruling the demurrer and pleas are affirmed. All exceptions are overruled. The final decree as modified is affirmed. The final decree on the contempt petition is affirmed.

*So ordered.*